*ORIGINAL*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB 1 3 2007

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| GEORGE RIVAS, | ) |
| | ) |
| Petitioner | ) |
| | ) |
| v. | ) |
| | ) |
| BRAD LIVINGSTON, | ) |
| | ) |
| Director, Texas Department of | ) |
| Criminal Justice, | ) |
| Correctional Institutions Division | ) |
| | ) |
| Respondent | ) |

No. **3-07 CV 0 2 9 3 - G**

## MEMORANDUM OF LAW IN SUPPORT OF MOVANT'S PETITION FOR A WRIT OF *HABEAS CORPUS* PURSUANT TO U.S.C. §2254

**FRANKLYN MICKELSEN**
Texas Bar #14011020
Broden & Mickelsen
2707 Hibernia Street
Dallas, TX 75204
(214) 720-9552
(214) 720-9594 (fax)

**ROBERT J. HERRINGTON**
Texas Bar # 00790163
Law Office of Robert Herrington
P.O. Box 262234
Plano, TX 75093
(214) 557-0577
(214) 557-0599

## ATTORNEYS FOR GEORGE RIVAS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

| | |
|---|---|
| GEORGE RIVAS, | ) |
| | ) |
|     Petitioner | ) |
| | ) |
| v. | )   No. _____ |
| | ) |
| | ) |
| NATHANIEL QUARTERMAN, | ) |
| Director, Texas Department of | ) |
| Criminal Justice, | ) |
| Correctional Institutions Division | ) |
| | ) |
|     Respondent | ) |
| _____ | ) |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOVANT'S PETITION FOR A WRIT OF *HABEAS CORPUS* PURSUANT TO U.S.C. §2254</u>

FRANKLYN MICKELSEN
Texas Bar #14011020
Broden & Mickelsen
2707 Hibernia Street
Dallas, TX 75204
(214) 720-9552
(214) 720-9594 (fax)

ROBERT J. HERRINGTON
Texas Bar # 00790163
Law Office of Robert Herrington
P.O. Box 262234
Plano, TX 75093
(214) 557-0577
(214) 557-0599

## ATTORNEYS FOR GEORGE RIVAS

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv-ix

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

STATEMENT OF FEDERAL *HABEAS* CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . .5

EXHAUSTION OF REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

PROCEEDINGS BELOW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    Jury Verdict and Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    B.    Direct Appeal at the State Level. . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    The State *Habeas Corpus* Petition. . . . . . . . . . . . . . . . . . . . . . . . . 22

FEDERAL *HABEAS* CLAIMS  –  LAW AND ARGUMENT

    A.    Errors at Guilt Phase of Trial

        1.    Ineffectiveness of counsel –  failure to object to improper argument of prosecutor concerning "intent" under Texas capital murder law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

        2.    Ineffectiveness of counsel –  failure to object to jury venire that did not reflect a fair cross section of the community. . . . 31

B.    Errors at Punishment Phase of Trial

1.    Violation of Due Process – improper expert testimony on
      future dangerousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2.    Ineffectiveness of counsel – failure to object to prosecutor's
      reading of out-of-court statements by co-defendants . . . . . . . . 53

3.    Manner of execution in Texas violates Eighth Amendment's
      guarantee against Cruel and Unusual Punishment . . . . . . . . . 67

4.    Violation of Due Process – improper allocation of burdens
      of proof in jury instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . 74

5.    Violation of Due Process – vague terms in "special issues"
      instruction to the jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

6.    Violations of due process and jury trial guarantees by
      requirement of 10 "no" votes on special issue #3  . . . . . . . . . .85

7.    Due process violation – jury instruction preventing
      defendant from showing unlikelihood of release on parole . . . .91


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Aldrich v. State*, 928 S.W. 2d 558 (Tex. Cr. App. 1996) . . . . . . . . . . . . . . . . . . 30

*Anderson v. Quarterman,* slip copy, 2006 WL 3147544
(5th Cir. Nov. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Arizona v. Fulminante*, 499 U.S. 279, at 294 (1991) . . . . . . . . . . . . . . . . . . . . . 30

*Barefoot v. Estelle*, 463 U.S. 880, 916 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bockting v. Bayer,* 399 F.3d 1010 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 70

*Boyde v. California*, 494 U.S. 370, 380 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Brasfield v. United States*, 272 U.S. 448, 450 (1926). . . . . . . . . . . . . . . . . . . . 57

*Brown v. Texas*, 522 U.S. 940 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*California v. Brown*, 479 U.S. 538, 541 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Castandea v. Partida*, 430 U.S. 482, 495 (1977) . . . . . . . . . . . . . . . . . . . . . . 30

*Cofield v. State*, 891 S.W.2d 952, 956 (Tex. Cr. App. 1994) . . . . . . . . . . . . . . 65

*Collier v. State*, 959 S.W. 2d 621, 623-24 (Tex. Crim. App. 1997) . . . . . . . . 77-78

*Crawford v. Washington*, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 593-95 (1993) . . . 49

*Davis v. State,* 506 S.W.2d 909, 911 (Tex.Cr.App 1974) . . . . . . . . . . . . . . . . . 18

*Deeb v. State,* 815 S.W.2d 692, 696 (Tex.Cr.App. 1991) . . . . . . . . . . . . . . . . . . 64

*Douglas v. Alabama,* 380 U.S. 415 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . .67

*Duren v. Missouri,* 439 U.S. 357 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*English v. State,* 592 S.W.2d 949 (Tex.Cr.App. 1980) . . . . . . . . . . . . . . . . . . . 17

*Francis v. Franklin*, 471 U.S. 307, 315-316 (1985) . . . . . . . . . . . . . . . . . . . . . .56

*Frye v. United States*, 293 F. 1013 (App. D.C. 1923) . . . . . . . . . . . . . . . . . . . . 49

*Francis v. Franklin*, 471 U.S. 307, 315-316 (1985) . . . . . . . . . . . . . . . . . . . . . .60

*Godfrey v. Georgia,* 466 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Harris v. United States,*  536 U.S. 550 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Hernandez v. Texas*, 347 U.S. 475, 479-480 (1954) . . . . . . . . . . . . . . . . . . . . . .30

*Hughes v. Johnson,* 191 F.3d 607, 615 (5th Cir.1999) . . . . . . . . . . . . . . . . . . . .43

*Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . 55

*James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.1993). . . . . . . . . . . . . . . . . . . . .43

*Jones v. Georgia,* 389 U.S. 24, 25 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jones v. United States*, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jurek v. Texas*, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Knox v. State,* 744 S.W. 2d 53, 63-64 (Tex. Crim. App. 1987),
    *cert. denied*, 486 U.S. 1061 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

*Kubat v. Thieret*, 867 F.2d 351, 369-373 (7th Cir.),
    *cert. denied*, 493 U.S. 874 (1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

*Kuhmo Tire Company, Ltd., v. Carmichael*, 119 S.Ct. 1167 (1999) . . . . . . . . . . .49

*Lave v. Dretke*, 444 F.3d 333 (5th Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . 70

*Lee v. Illinois,* 476 U.S. 530, 541 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . .66

*Lewis v. Jeffers,* 497 U.S. 766 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*Lilly v. Virginia,* 527 U.S. 116 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Lowenfeld v. Phelps*, 484 U.S. 231, 239-240 (1988) . . . . . . . . . . . . . . . . . . . . 57

*Maleng v. Cook*, 490 U.S. 488, 493 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Maryland v. Cartwright,* 486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 44

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . .40

*Mendez v. State,* 56 S.W.3d 880, 891  (Tex.App. - Austin, 2001, pet. ref'd) . . . . . 65

*Miller v. Johnson,* 200 F.3d 274 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 55

*Mills v. Maryland*, 486 U.S. 367, 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . .58

*Milone v. Camp*, 22 F.3d 693 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 53

*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) . . . . . . . . . . . . . . . . . . . . . . . .27

*O'Connor v. Consolidated Coin Cateres Corp.,* 517 U.S. 308 (1996). . . . . . . . . 31

*Ohio v. Roberts*, 448 U.S. 56 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . 31

*Peyton v. Rowe*, 391 U.S. 54, 64-65 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reese v. Livingston*, 453 F.3d 289 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 82

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Roney v. State,* 632 S.W.2d 598, 603 (Tex. Crim. App. 1982) . . . . . . . . . . . . . . .43

*Roper v. Simmons*, 543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

*Rowell v. Dretke,* 398 F.3d 370 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Simmons v. South Carolina*, 512 U.S. 154, 168-169 (1994) . . . . . . . . . . . . . . . 75

*Smith v. State*, 898 S.W. 2d 838, 846 (Tex. Crim. App. 1994),
    *cert. denied,* 516 U.S. 843 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Smith v. State,* 779 S.W.2d 417, 419 (Tex. Crim. App.1988) . . . . . . . . . . . . . . . 43

*State v. Williams*, 392 So.2d 619, 631 (La. 1980) . . . . . . . . . . . . . . . . . . . . . . . 57

*Strickland v.Washington*, 466 U.S. 688 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Taylor v. Louisiana* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Thacker v. Dretke*, 396 F.3d 607, 617 (5th Cir.2005) . . . . . . . . . . . . . . . . . . . . . 75

*Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946) . . . . . . . . . . . . . . . . . . 30

*Trop v. Dulles*, 356 U.S. 86, 100-101 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Lara*, 181 F.3d 183 (1st Cr. 1999) . . . . . . . . . . . . . . . . . . . . . . 30

*United States. v. McCaskey*, 9 F.3d 368 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . 54

*United States v. Weaver*, 267 F. 3d 231 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . .30

*Vasquez v. Hillary*, 474 U.S. 245 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Walton v. Arizona,* 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Wigging v. Smith*, 539 U.S. 510, 520 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*Williamson v. United States,* 512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Willingham v. State,* 897 S.W. 2d 351, 359 (Tex. Crim. App. 1994),
    *cert. denied,* 516 U.S. 946 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Woods v. Johnson,* 75 F.3d 1017, 1033-34 (5th Cir.1996) . . . . . . . . . . . . . . . . . 43

*Zant v. Stephens,* 462 U.S. 862. 878 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**Statutes**:

28 U.S.C. §2254(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. 2254 (d)(1) and (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TEX. CODE CRIM. PROC. ANN. ART. 11.071. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TEX. CODE CRIM. PROC. ANN. Art. 37.071 §2(d)(2) . . . . . . . . . . . . . . . . . . . 52

TEX. CODE CRIM. PROC. ART 44.29 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

TEX. PENAL CODE ANN. § 29.03(a) 7.02(b) . . . . . . . . . . . . . . . . . . . . . . . . . 17

TEX. R. EVID. Rules 801, 802 & 803. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**Other:**

Ted M. Eades, *Revisiting the Jury System in Texas: A study of the
Jury Pool in Dallas County,* 54 SMU L. REV. 1813 (2001) . . . . . . . . . . . . . . . 26

G. Michael Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and
Its Progeny,* 29 Creighton L. Rev. 939, 974 (1996). . . . . . . . . . . . . . . . . . . . . 49

Texas Department of Criminal Justice Website, *available at*
http://www.tdcj.state.tx.us/stat/drowfacts.htm . . . . . . . . . . . . . . . . . . . . . . . . 81

Death Penalty Information Center, *available at*
http://www.deathpenaltyinfo.org/article.php?scid=8&did=478 . . . . . . . . . . . . .83

Jurist Legal News and Research, December 31, 2006, *available at*
http://jurist.law.pitt.edu/currentawareness/jeb.php . . . . . . . . . . . . . . . . . . . . . 84


"Executions Halted in Two States After Botched Injection," *available at*
http://www.cnn.com/2006/LAW/12/15/diaz.execution.ap/index.html . . . . . . . . .87

"Lethal Injection Execution Cruel, Say US Researchers," *available at*
http://www.smh.com.au/news/World/Lethal-injection-execution-cruel-says-US-res
earchers/2005/04/14/1113251743563.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

## STATEMENT OF THE CASE[1]

On Christmas Eve of 2000, petitioner George Rivas ("Mr. Rivas") and six companions escaped from a Texas prison. They made their way to Irving, Texas, where they planned and carried out the robbery of an Oshman's sporting goods store. They robbed the store and several employees. During the course of this robbery, Irving Police Officer Aubrey Hawkins drove into the store's parking lot, where he was shot by Mr. Rivas, who had already exited the store. During or shortly before the shooting, several of Mr. Rivas's companions exited the store and also began shooting at Hawkins. Hawkins was struck by gunfire from several different weapons and died at the scene. Mr. Rivas was indicted in Dallas County, Texas for knowingly and intentionally causing the death of Aubrey Hawkins in the course of committing robbery of another individual, Wesley Ferris. (CR 2) Ferris was a department manager of the Oshman's store in Irving, Texas. (28 RR 41) After trial by jury in Dallas

---

[1]Petitioner George Rivas requests that this Court take judicial notice of the appellate record of the proceedings underlying the capital murder conviction challenged in this federal writ application. The direct appeal is denominated "GEORGE RIVAS V. STATE" and bears a Texas Court of Criminal Appeals cause number 74,143. "CR" refers to the clerk's record on appeal, and "RR" refers to the reporter's record on appeal, each of which consists of one or more volumes numbered consecutively, beginning with "1." "SX" refers to an exhibit introduced by the State, and "DX" refers to an exhibit introduced by the defense. Petitioner further requests that this Court take judicial notice of the proceedings initiated by his Application for a Writ of Habeas Corpus under TEX. CODE CRIM. PROC. ANN. Art. 11.071, filed with the Texas Court of Criminal Appeals. The state writ application is denominated "EX PARTE GEORGE RIVAS, Applicant" and bears a Texas Court of Criminal Appeals cause number WR-63,286-01.

1

County beginning June 25 and ending August 29, 2001, petitioner was found guilty and sentenced to death.

Mr. Rivas' conviction and sentence were affirmed by the Texas Court of Criminal Appeals on June 23, 2004. On February 15, 2006, the Texas Court of Criminal Appeals denied Mr. Rivas' Application for Writ of Habeas Corpus pursuant to Texas Code of Criminal Procedure Article 11.071.

In February 13, 2007, Mr. Rivas filed his "Petition for a Writ of Habeas Corpus by a Person in State Custody" with this court. This memorandum is offered in support of the pending federal petition.

## **JURISDICTION**

> The Supreme court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgement of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. §2254(a).

Mr. Rivas is confined in the Polunsky Unit of the Texas Department of Corrections in Livingston, Texas. Respondent Nathaniel Quarterman, Director of the Institutional Division of the Texas Department of Criminal Justice, has a detainer lodged against him pursuant to the judgment and sentence of death issued by the 283rd Judicial District Court for Dallas County. Mr. Rivas was already serving several terms of life imprisonment, two of which were consecutive, at the time the judgment imposing the death penalty was issued.[2] The consecutive life terms, as well as several other concurrent life terms, remain undischarged. His confinement pursuant to the judgment imposing death and resulting detainer is in substantial violation of the

---

[2]Mr. Rivas may challenge both his sentence of death and his conviction for capital murder. Should his death sentence be revoked, resulting in a sentence of automatic life, he would nevertheless be able to challenge the conviction resulting in the imposition of the life sentence despite the fact that it would be concurrent to other life sentences imposed for crimes that are not the subject of this petition. *See Peyton v. Rowe*, 391 U.S. 54, 64-65 (1968) (holding the petitioner may challenge second of two convictions for which consecutive sentences were imposed although he is still serving the term imposed for the first conviction); *Maleng v. Cook*, 490 U.S. 488, 493 (1989) (reaffirming *Peyton* in dicta and noting its application to situations in which petitioner is subject to more than one sentence in more than one jurisdiction, as long as the sentence not yet being served is subject to a detainer.)

3

Constitution and laws of the United States. Mr. Rivas files this Petition for a Writ of

Habeas Corpus pursuant to 28 U.S.C. §2254(a).

4

## STATEMENT OF FEDERAL *HABEAS* CLAIMS

A. Errors at Guilt Phase of Trial

    1.     Ineffectiveness of counsel – trial counsel was ineffective in failing to object to improper argument of prosecutor concerning "intent" under Texas capital murder law.

    2.     Ineffectiveness of counsel –  trial counsel was ineffective in failing to object to jury venire that did not reflect a fair cross section of the community.

B.    Errors at Punishment Phase of Trial

    1.     Violation of Due Process – Mr. Rivas' due process rights were violated by the introduction into evidence of improper expert testimony regarding the issue of his future dangerousness.

    2.     Ineffectiveness of counsel – trial counsel was ineffective in failing to object to prosecutor's reading before the jury of unsworn, out-of-court statements by co-defendants.

3.  Cruel and Unusual Punishment – The manner of his impending execution violates Mr. Rivas' constitutional guarantees under the Eighth Amendment forbidding Cruel and Unusual Punishment.

4.  Mr. Rivas' due process rights were violated by the court's instructions to the jury which failed to place the burden of proving lack of mitigating circumstances on the state.[3]

5.  Violation of Due Process – Mr. Rivas' due process rights were violated by the trial court's failure to define vague terms in the "special issues" instruction to the jury.

6.  Violations of Due Process and Jury Trial Guarantees – Mr. Rivas' rights to due process and to trial by jury were violated by the trial court's requirement of 10 "no" votes on special issue #3 (mitigation).

7.  Violation of Due Process – Mr. Rivas' rights to due process were violated by a jury instruction preventing defendant from showing unlikelihood of release on parole.

---

[3]Claims of error in sections B4 through B7 inclusive are foreclosed under current Fifth Circuit precedent. *See infra.*

## **EXHAUSTION OF REMEDIES**

An application for a writ of habeas corpus in behalf of a person pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State ....

28 U.S.C. §2254(a)

Mr. Rivas has previously raised all the claims raised in his petition and argued in this memorandum,  except for claim #B-3 (manner of execution as cruel and unusual punishment), in the highest court in Texas.  *See* "Brief for Mr. Rivas," *George Rivas v. The State of Texas,* No. 74,143 (Tex. Crim. App. Oct. 17, 2002). The claims raised in the direct appeal were rejected by the Texas Court of Criminal Appeals on June 23, 2004.  A copy of the opinion on direct appeal is attached as Attachment 1.

Mr. Rivas also filed an application for writ of habeas corpus with the Texas Court of Criminal Appeals raising the balance of all the claims presented in this federal petition, except for claim  #B-3 (lethal injection as cruel and unusual punishment). The claims raised in the state application for writ of habeas corpus were denied by the Texas Court of Criminal Appeals on February 15, 2006.  A copy of the

Order denying the state application for writ of habeas corpus is attached as

Attachment 2.[4]

---

[4]If it were not for the exhaustion requirement, Mr. Rivas would bring at least two additional claims in this Federal petition. One would pertain to the bias of Judge Cunningham, the State district judge who made recommendations of fact and conclusions of law for the Court of Criminal Appeals in relation to the State habeas corpus proceeding. Many months after the State habeas petition was filed, Judge Cunningham announced his candidacy for District Attorney of Dallas County. On his campaign website Judge Cunningham lauded the fact that he had been appointed to the bench in order to preside over the "Texas Seven" trials and to insure that there was a "just" verdict. He then noted that all the defendants had since received the death penalty. Any claim relating to Judge Cunningham's bias is unexhausted and must first be raised in a "successor" State writ before it may be the subject of a federal petition. Because the filing of a successor State writ would not toll the statute of limitations under the "AEDPA" for those claims that are exhausted, and because Texas law prohibits the pendency of a "successor" State writ while a Federal petition for a writ of habeas corpus is proceeding, Mr. Rivas does not presently intend to file a "successor" State writ. In addition to this issue, Mr. Rivas believes the State suppressed evidence of the fact that Officer Aubrey Hawkins discharged his firearm and that such evidence would have been mitigating. Although this claim was raised in the State habeas proceeding, admittedly the defense did not meet its burden of proof of showing that the State, in fact, had suppressed this evidence. If evidence should arise in the future establishing that the State had suppressed favorable mitigating evidence this too might be the subject of a "successor" State habeas petition.

## STATEMENT OF FACTS

Petitioner George Rivas was indicted for knowingly and intentionally causing

the death of Aubrey Hawkins, a peace officer, and for intentionally causing Hawkins'

death in the course of committing robbery of another individual, Wesley Ferris. (CR

2)  Ferris was a department manager of an Oshman's store in Irving, Texas   (28 RR

41)

*Evidence Presented at the Guilt Phase of Trial*

On Christmas Eve of 2000, Mr. Rivas and five companions entered the

Oshman's store just before it was set to close, at six P.M., with the intent to commit

robbery.  (28 RR 42, 44, 56-57, 106; 29 RR 41-42, 97, 111; 30 RR 12-13,27) Mr.

Rivas and Larry Harper, a companion who was separately indicted for his role in the

homicide of Officer Hawkins, were dressed as security guards, and on the pretense

of trying to identify a gang of thieves, they gathered the employees at the front of the

store and asked them to review a photo spread.  (28 RR 56-59, 106; 29 RR 42-45, 50-

51, 61, 98-99, 106-107; 30 RR 30; 34 RR 109)   Mr. Rivas then pulled a pistol,

pointed it in the air, and announced that a robbery was in progress.  (28 RR 64, 123;

29 RR 52, 109; 30 RR 31-32, 43; 34 RR 110)  When Ferris made a gesture suggesting

that he might resist, Mr. Rivas pointed the gun at him and told him not to try anything

or Mr. Rivas "would have to" hurt everyone.  (28 RR 65-66, 124-125; 29 RR 53, 112-

9

113, 140; 30 RR 33; 34 RR 112)  Four of Mr. Rivas' companions then emerged from the aisles of the store, where they had been posing as regular customers. (28 RR 67, 29 RR 48-50; 34 RR 110)  These were Michael Rodriguez, Donald Newbury, Joseph Garcia, and Randy Halprin. (29 RR 48-50, 68-71, 101, 104, 137; 34 RR 110-111; 45 RR SX-1)  A fifth companion, Patrick Murphy, waited in a truck in the parking lot, acting as a lookout for the police and maintaining radio contact with Mr. Rivas inside the store.  (28 RR 71-72; 29 RR 113, 139; 34 RR 115; 45 RR SX-1)

All the employees agreed that Mr. Rivas seemed to be in charge.  (28 RR 117; 29 RR 45, 146; 33 RR 176)  Mr. Rivas directed the employees to a break room in the back of the store, where he left them to be bound by his companions.  He then escorted Ferris back toward the cash registers and store safe in order to collect the money in the store.  (28 RR 74, 76-82; 29 RR 59-60, 116-118, 120; 30 RR 35;  RR SX-1)  In all, Mr. Rivas took about $70,000 in cash.  (28 RR 83)  He then led Ferris back to the break room and left him there while he took the keys to Ferris's Ford Explorer, which was parked in the front of the store, and drove it around to the loading dock in the back.  (28 RR 80, 90, 127; 30 RR 20, 22-23; 45 RR SX-1)  About this time, Murphy radioed Mr. Rivas to tell him that a police car had arrived and was heading  around to the back of the store.  (45 RR SX-1)  Mr. Rivas urgently radioed

Case 3:06-cv-00344-B   Document 24   Filed 02/13/07   Page 21 of 55   PageID 121


his companions in the store to tell them to abandon their efforts inside the store and to meet him outside at the dock. (28 RR 92-93; 29 RR 127; 34 RR 120; 45 RR SX-1)

What happened next is not entirely clear from the evidence, but according to a videotape taken from a neighboring car lot, the remainder of the entire incident took place in less than one minute. (30 RR 98; 33 RR 112; 47 SX-74) Officer Hawkins, of the Irving Police Department, pulled up behind the Explorer. (33 RR 184; 45 RR SX-1) Before he could get out of the squad car, Mr. Rivas approached the vehicle, drew his gun, and pointed it at the windshield. (45 RR SX-1) His intent was to subdue and handcuff Hawkins. (33 RR 192) He then saw Hawkins reach down with his right hand, at which point Mr. Rivas fired once toward the windshield with the intent to hit Hawkins in the right chest area, where Mr. Rivas knew Hawkins would be protected by a ballistics vest. (29 RR 34-35) Hawkins then reached down with his left hand, leading Mr. Rivas to believe he was reaching for a weapon. (45 RR SX-1) By this time, Mr. Rivas was by the driver's side window of Hawkins' squad car, and he then shot at Hawkins in the left area of his chest. (45 RR SX-1) Damage to Hawkins' shirt and ballistics vest, and a bruise later found on his torso, were consistent with this shot. (31 RR 75, 94-95; 32 RR 13-14, 18-20; 33 RR 189, 192; 47 SX-203) Immediately thereafter, Mr. Rivas heard popping noises and saw flashes, and he was himself shot in the abdomen. (28 RR 94-95; 29 RR 66, 90-93,

128-130; 30 RR 39-40; 30 RR 52-60; 34 RR 121-122; 45 RR SX-1) He then fired three more shots in succession, these into the driver's side window. He was then shot again, this time in the right leg. (45 RR SX-1) Forensic DNA evidence showed Mr. Rivas' blood on the driver's side car seat of the Explorer. (28 RR 112; 30 RR 134-135; 34 RR 46-47)

Officer Hawkins suffered a total of eleven wounds, three of which were fatal. (31 RR 58-73, 89; 53 RR DX-9) He was shot by at least two separate shooters, and five different guns were fired at the scene. (30 RR 121; 34 RR 73)

Hawkins' car rolled forward during the incident, ramming the Explorer from behind. (30 RR 89, 145) One of the robbers, it is not clear who, then pulled Hawkins from his vehicle and dragged him a distance of about six feet. (30 RR 100-101, 109-110. 33 RR 113) Someone also moved the squad car so that it was no longer blocking the Explorer, causing it to roll across the pavement and strike a trailer near the loading dock, where it came to rest. (30 RR 101, 146; 33 RR 114; 45 (RR SX-1) Mr. Rivas slowly drove the Explorer out of the lot and onto the street. (30 RR 74) In the process, he apparently ran over Officer Hawkins, dragging him another ten feet. (30 RR 102-103, 107-109, 115-117, 146-147; 33 RR 113; 34 RR 38, 48-49) In addition to the money, Mr. Rivas and his companions escaped from the Oshman's store with 44 guns, including 34 pistols and 10 rifles and shotguns. (28 RR 109-110) They then

traveled to Colorado, where they were all arrested (except for Larry Harper, who committed suicide as police closed in to arrest him). (32 RR 135, 161, 170-179; 197) The arrest followed a tip from a citizen. (31 RR 25)

*Evidence Presented at Punishment Phase of Trial*

At the punishment phase of the trial, the prosecution established that Mr. Rivas had a criminal history beginning at a young age. His younger half-sister testified that Mr. Rivas sexually abused her in their grandmother's house from the time she was six until she was 16 years old. (38 RR 36-42)

On December 21, 1998, Mr. Rivas committed his first robbery; the victim was a Payless Shoe Store where he had previously worked. (38 RR 137-147) Two weeks later, on January 5, 1989, he was arrested for burglary of a habitation, convicted, and placed on six months probation. (36 RR 13; 39 RR 23-37; 50 RR SX-498)

Then, in late 1992, he committed a string of robberies extending into 1993 that would eventually land him in prison serving several life sentences. In September, 1992 he robbed a Checker Auto Parts store. (39 RR 47-71) In December, he robbed and Auto Zone in Lubbock. (39 RR 72-75). Then, in April 1993, Mr. Rivas robbed an Oshman's store in El Paso for he which he was later convicted and sentenced to seven concurrent life sentences. (36 RR 15-16; 39 RR 76-79; 50 RR SX-498) Police

13

later recovered a large cache of weapons in Mr. Rivas' apartment that had been taken during the 1993 Oshman's robbery. (40 RR 75-94, 96-98)

Mr. Rivas also robbed a Furr's Supermarket on May 12, 1993. (39 RR 100-108) He was finally captured by police after a bungled robbery of a Toys-R-Us store in El Paso two weeks later, on May 25, 1993, for which he was convicted and sentenced to ten concurrent life sentences (36 RR 13-15; 40 RR 8-74; 50 RR SX-498)

In March of 1995, his earlier probation for the burglary offense was revoked, and Mr. Rivas was again sentenced to life in prison; this conviction was stacked upon the prior 16 concurrent life sentences. (36 RR 13; 50 RR SX-498)

On December 13, 2000, while serving seventeen life sentences, Mr. Rivas planned an escape from the Connally Unit of the Texas Department of Criminal Justice – Institutional Division, along with six other inmates who joined him later that same month in the Oshmans' robbery. (36 RR 22-125; 37 RR 8-112) The group first made their way to Houston, where they robbed a Radio Shack on December 15, and then robbed an Auto Zone on December 18. (37 RR 142-158; 38 RR 6-30, 63-84) In the recreational vehicle where Mr. Rivas was later arrested, police found many of the guns taken during the prison break and the Oshman's robbery, as well as police scanners and other electrical equipment taken from the Radio Shack (33 RR 22-100, 103-104) In answer to a lengthy hypothetical question based upon this criminal

14

history, Psychiatrist Richard Coons testified that Mr. Rivas showed antisocial traits and a lack of conscience that would likely render him a future danger both to the public at large and to the prison population. (41 RR 22-79)

The defense for its part presented evidence that Mr. Rivas was typically a "polite and cordial" robber who went out of his way to make the experience of his victims as painless as possible, even when they did not immediately cooperate. (34 RR 108; 36 RR 95-100; 37 RR 108; 38 RR 6-7, 26-30, 39 RR 59-62, 69-71, 106-105; 40 RR 30-31, 47-51; 41 RR 100-108; 42 RR 75-76, 81-82, 86, 103; 43 RR 30-31, 56, 149-150, 159; 44 RR 30) Mr. Rivas did not resist arrest in Colorado, where witnesses had identified him from the television show "America's Most Wanted." (32 RR 182-184; 43 RR 91-94; 44 RR 38-41)  He  was never a disciplinary problem while awaiting trial. (42 RR 7,9)

Mr. Rivas testified at length in his own behalf at the punishment phase of the trial. He denied ever having sexually abused his half-sister.  He explained that he had refused to turn out for prison work detail, for which he had been disciplined, because he was afraid of retaliation from Hispanic prison gangs that he had refused to join. (41 RR 120-122, 145-151, 175, 190-191; 42 RR 17-18, 39-42)  He admitted to the string of robberies that landed him in prison, but testified that it was never his intention to hurt anybody. (42 RR 48-31) Further, Mr. Rivas explained that he had only meant to

15

subdue Hawkins behind the Oshman's store, and that he deliberately aimed at the ballistics vest when Hawkins appeared to be reaching for a weapon. (43 RR 67-70, 76-77, 98, 103-104, 106-107, 115-116) He did not know whether his companions intended to kill Officer Hawkins. (43 RR 104) Also, he told the jury that he did not learn until the trial itself that he had run over Officer Hawkins with the Explorer. (43 RR 75, 79)

## SUMMARY OF THE ARGUMENT

A.    Guilt-Innocence Phase

At the guilt/innocence phase, Mr. Rivas' attorneys were ineffective in at least two respects:

First, they failed to object to illegal and improper argument by prosecutors, to wit: that the jury could convict him of capital murder as a "party" under a co-conspirator theory, without first finding that the co-conspirator who actually caused the victim's death did so knowingly or intentionally. This effectively permitted the jury to condemn Mr. Rivas to death even if they found that no one acted more than recklessly with regard to the life of the victim.

Second, the attorneys were ineffective for failing to object to a jury venire, from which the jury was selected, that failed to represent a fair cross-section of the Dallas County, Texas community. While statistics show that Hispanics make up 26.4% of the voting-age population, and young adults make up 39.8% of the population, the Hispanic portion of the venire was only 10.9% of the whole, and the proportion of young adults was, at best, only 20.4%. This violated Mr. Rivas' constitutional rights to a fair and impartial jury and to effective assistance of counsel.

B.    Punishment Phase

At the punishment phase, Mr. Rivas' constitutional rights were violated in several respects: first, the trial court unconstitutionally allowed expert testimony regarding Mr. Rivas' future dangerousness. In violation of the Supreme Court's test for determining scientific reliability, Dr. Richard Coons was permitted to testify without the benefit of scientific data upon which the jury could rely in assessing future dangerousness. This case should be reversed and remanded for a new punishment hearing.

Second, Mr. Rivas received ineffective assistance of counsel at the punishment phase when trial counsel failed to object when the prosecutor impeached Mr. Rivas' testimony with the written statements of three non-testifying co-defendants in violation of the Mr. Rivas' Sixth Amendment right to confrontation. Three of the co-defendants gave un-confronted statements outside of court regarding their roles and incriminated Mr. Rivas. These statements, though never entered into evidence, were read out loud and verbatim to the jury, and Mr. Rivas had no opportunity to cross-examine any of the three declarants.

Third, the penalty imposed is unconstitutional because the manner of execution in Texas (lethal injection) violates the constitution's prohibition against cruel and unusual punishment.

18

Fourth, the trial court unconstitutionally (though in accordance with Texas law, but contrary to *Apprendi v. New Jersey* and its progeny) failed to instruct the jury that the punishment issue relating to mitigation requires the state to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt.

Fifth, the trial court failed to define unconstitutionally vague terms in the special issues that effectively determine the difference between a life sentence and the death penalty. These terms include "probability" and "criminal acts of violence." The failure to define these operative words violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of society's most severe penalty. This failure to so instruct the jury violated Mr. Rivas' rights under the Sixth, Eighth, and Fourteenth Amendments. Accordingly, the vague and undefined terms incorporated in the three special issues invalidate the Texas death penalty scheme. Mr. Rivas is entitled to a new trial in which the court clearly defines all the terms the jury is instructed to use.

Sixth, Mr. Rivas' rights to due process and to a jury trial were violated by jury instructions the trial court's stated requirement of 10 "no" votes on special issue #3 (mitigation) in order to avoid the death penalty and impose life imprisonment. According to the instructions, all twelve jurors were required to answer the future

dangerousness issue affirmatively before the trial court could impose the death penalty; a life sentence, on the other hand, required that at least ten jurors answer one of the special issues (mitigation) negatively.  Unanimity also had to exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors were required to vote to grant leniency.  The Texas death penalty scheme thus leads reasonable jurors to believe that their votes for a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.

Seventh, the jury instructions unconstitutionally prohibited the jury from considering the effect of parole. Mr. Rivas was already serving consecutive life terms in prison at the time of the instant offense.  Considering the nature of the instant offense (a violent escape followed by a series of robberies culminating in homicide), there is little likelihood, if any, that Mr. Rivas will ever be granted parole. Yet the jury was told that, with a life sentence, Mr. Rivas would be eligible for parole in 40 years. The instructions mentioning parole, but prohibiting its consideration, tied the defense counsel's hands and prevented them from ever developing this factual and legal reality for the jury in connection with the special issues, especially future dangerousness.  This violated Mr. Rivas' right to due process of law.

## PROCEEDINGS BELOW

A.   Jury Verdict and Sentence

The jury found and announced its verdict of "guilty" of capital murder on August 21, 2001.  On August 29, 2001, they answered the "special issues" as follows:

Special Issue Number 1: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, George Rivas, would commit criminal acts of violence that would constitute a continuing threat to society? Answer yes.  Signed Otis Ogburn, presiding juror.  (RR44: 101-102)

Special Issue Number 2: Do you find from the evidence beyond a reasonable doubt that the defendant, George Rivas, actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?  Answer yes. Signed Otis Ogburn, presiding juror.  (RR44: 102)

Special Issue Number Three: Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life

imprisonment rather than a death sentence be imposed? Answer no. Signed Otis Ogburn, presiding juror. (RR44: 102)

B.    Direct Appeal

Mr. Rivas appealed to the Texas Court of Criminal Appeals and alleged 17 points of error, including five of the grounds alleged in this federal petition.[5] On June 23, 2004, the Court of Criminal Appeals rejected the direct appeal and affirmed the conviction and sentence.

C.    State Habeas Claims

On September 12, 2003, Mr. Rivas filed an application for Writ of Habeas Corpus under Texas Code of Criminal Procedure Article 11.071, alleging eleven grounds on which the Mr. Rivas' restraint was illegal.   Four of the grounds raised in the state application (one of which was also raised on direct appeal) are alleged in this federal petition.[6] On February 15, 2006, the Texas Court of Criminal Appeals denied the state application for Writ of Habeas Corpus.  Appointment of the undersigned followed for purpose of preparing and filing this federal petition.

---

[5]The claims raised here that were also raised on direct appeal are: B-1, B-4, B-5, B-6, and B-7.

[6]The claims raised here that were also raised in the state habeas application are: A-1, A-2, B-2, and B-4. Claim B-3 (lethal injection as cruel and unusual punishment) was raised neither in the direct appeal nor in the state habeas application.

## FEDERAL *HABEAS* CLAIMS

A.    Constitutional Violations at Guilt Phase

1.    INEFFECTIVE ASSISTANCE OF COUNSEL -- FAILURE TO OBJECT TO IMPROPER ARGUMENT OF PROSECUTOR CONCERNING INTENT UNDER TEXAS STATE CAPITAL MURDER

### FACTUAL BACKGROUND

The trial court's charge to the jury at the guilt phase of trial authorized the jury to convict Mr. Rivas of capital murder either as a primary actor, who intentionally or knowingly caused Hawkins's death, or as a party under the conspiracy theory of party liability, criminally responsible for an *intentional or knowing* killing perpetrated by one of his co-conspirators when Applicant should have anticipated such an event. (1 CR 245-247; 35 RR 18-20) During his final argument to the jury at the guilt phase of trial, Mr. Rivas' trial counsel conceded that Mr. Rivas was guilty, at least, of either aggravated assault of a peace officer, or aggravated robbery. (35 RR 40) But he argued repeatedly, and indeed it was the overriding theme of Mr. Rivas' defense, that the State's evidence failed to establish beyond a reasonable doubt that either Mr. Rivas or any of the co-conspirators shot Hawkins *with the specific intent to cause his death*, and that a conviction for capital murder was therefore not warranted. (35 RR 41, 43, 44, 46-47, 48, 53, 56-58)

23

Immediately after defense counsel concluded his argument, the prosecutor rejoined

with the following:

> The evidence in this case is overwhelming. It is a case
> which you – it has been explained to you that the State can
> prove one of two ways, or both, and I submit to you we
> have done both. We can prove to you that George Rivas
> intentionally killed Aubrey Hawkins because he was a
> police officer and he knew that. We can prove to you that
> he killed Aubrey Hawkins because he murdered him during
> the course of a robbery. *Or we can prove to you that he
> entered into this conspiracy, and even if he didn't have
> the intent - let's just take for a moment that ludicrous
> explanation in his confession that he didn't have the
> intent to kill anyone out there. If you agree with that, he
> is still guilty under the law because he entered into a
> conspiracy to commit robbery and he should have
> anticipated that someone could die.*   And this is a plan
> destined to fail, folks.

(35 RR 58-59)

## ARGUMENT

The prosecutor urged the jury to convict Mr. Rivas as a party simply because

he "entered into this conspiracy," without any regard for whether the co-conspirator

who actually *did* cause Hawkins's death, who could never be conclusively identified

because five different guns and five different shooters fired at him, harbored a

specific intent to do so, or could have been reasonably certain his conduct would

cause Hawkins' death.  This argument was contrary to the law, as properly set out in

the court's charge. *See* TEX. PENAL CODE ANN. § 7.02(b), Texas Penal Code;

24

*English v. State*, 592 S.W.2d 949 (Tex.Cr. App. 1980). It essentially invited the jury to engage in jury nullification, and it should have provoked an objection from Applicant's attorneys. *Cf. Davis v. State,* 506 S.W.2d 909, 911 (Tex. Cr. App 1974) (reversible error for prosecutor to argue to jury in final summation that defendant not entitled to defense of accident because he was in the process of an illegal act when he claimed his weapon accidentally discharged, when law does not so delimit the law of accident). Since the crux of the defense was that *both* Mr. Rivas *and* his co-conspirators lacked the requisite culpable mental state to justify a conviction for capital murder, failing to object to this prosecutorial argument cannot reasonably be characterized as a legitimate tactical decision, much less a strategic move.  It was instead an oversight which seriously undermined their own chosen strategy.

### *Strickland v. Washington*

In *Strickland v.Washington*, 466 U.S. 688 (1984), the Supreme Court outlined the test that courts are to apply when considering an ineffective assistance of counsel claim. A habeas petitioner must establish (1) "that counsel's representation fell below and objective standard of reasonableness"; and (2) "any deficiencies in counsel's performance must be prejudicial to the defendant." *Id.* at 688 and 692.

The first prong is easily satisfied by the fact that Mr. Rivas's trial attorneys remained mute and did not object to the prosecutor's clear misstatement of the law.

In assessing harm (the second prong), the defendant must establish a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would likely have been different. A reasonable probability is one sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694. *Strickland* goes on to say, "the result of the proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694. "[T]he ultimate focus of the inquiry must be on the fundamental fairness of the proceeding ...." *Id.* at 696.

Had trial counsel objected to the prosecutor's improper argument concerning intent under the Texas capital murder statute, the objection would surely have been sustained. Moreover, it would have been almost impossible for the State to convincingly argue that Mr. Rivas (or for that matter, any of his co-defendants) harbored a specific intent that Officer Hawkins should die – which is, of course, a prerequisite for any rational jury verdict of guilty of *capital* murder, even under a conspiracy theory of parties. Had trial counsel then prevented the jury from considering the prosecutor's erroneous jury argument inviting the jurors to convict Mr. Rivas without regard for whether either he *or* and of his co-defendants actually harbored a specific intent to cause Hawkins's death, and there is at least a reasonable

26

probability that the jury would have convicted Mr. Rivas, at most, of some lesser

included offense of capital murder, but not of capital murder itself.  There is, in short,

a reasonable probability that, had trial counsel performed as reasonably competent

counsel should, Mr. Rivas would not have been convicted of an offense carrying the

death penalty – an obviously different result for *Strickland* purposes.

### The AEDPA

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States [.]

28 U.S.C. 2254 (d)(1).

A state court's decision is "contrary to" clearly established federal law if 1) the

state court "applies a rule that contradicts the governing law" announced in Supreme

Court cases, or 2) the state court decides a case differently than the Supreme Court

did on a set of materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12,

15-16 (2003).   A state court's application of clearly established federal law is

"unreasonable" within the meaning of AEDPA when the state court identifies the

correct governing legal principle from Supreme court precedent, but applies that

principle to the case in an objectively unreasonable manner. *Wigging v. Smith*, 539

U.S. 510, 520 (2003).

A writ of habeas corpus may also issue if the state court's adjudication of a

claim "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."   28 U.S.C.

§2254(d)(2).

With regard to this claim (failure to object to improper argument in guilt-

innocence phase), the Texas Court of Criminal Appeals adopted almost wholesale,

without discussion, elaboration, or modification, the "States' Proposed Factual

Findings Proposed Factual Findings and Legal Conclusions on Original Application

For Writ of Habeas Corpus," (hereinafter "the findings of fact") filed in the Dallas

County Court's suit record, on November 4, 2004.  A copy of the findings of fact is

attached herewith as "Attachment 3."[7]

The findings include[8], *inter alia*, that "applicant misinterprets the prosecutor's

argument and that an objection would have been meritless" (finding # 249); that the

---

[7]The state district court made a wholesale adoption of the State's Proposed Findings of Fact
and Conclusions of Law, which in turn was adopted by the Court of Criminal Appeals, with the
exception of paragraphs 269 - 293.

[8]See findings of fact 249-262, inclusive in Attachment 3

28

Court finds the prosecutor correctly stated that applicant's guilt as a party conspirator was contingent on a finding that he entered into a conspiracy to commit the robbery and should have anticipated the [sic] someone could die" (finding # 251), and "the Court finds that the argument's silence on the manner of the killing co-conspirator's mental state does not, in itself, convey the message that proof of an intentional killing was not a prerequisite to applicant's conviction for capital murder. And, the Court finds that such an inference would be illogical" (finding #253).

Mr. Rivas   has not "misinterpreted the prosecutor's argument." The prosecutor's illegal argument speaks for itself and is simply wrong under § 7.02(b) of the Penal Code and the jury instructions as noted above.

As to the finding that "the prosecutor correctly stated that applicant's guilt as a party conspirator was contingent on a finding that he entered into a conspiracy to commit the robbery and should have anticipated the [sic] someone could die," this is simply an irrelevant diversion from the problem. That the prosecutor did not err in one part − or every other part − of his argument does nothing to correct the damage done by the clear error.

As to finding #253, the state court failed to explain in any way how the inference "that proof of an intentional killing was not a prerequisite to applicant's conviction for capital murder" is illogical. The prosecutor's argument was

29

unambiguous and plainly juxtaposed two supposedly legitimate routes by which the jury could convict Mr. Rivas of capital murder: first, capital murder would lie if Mr. Rivas "intentionally killed Aubrey Hawkins because he was a police officer and he knew that, or *because he entered into a conspiracy to commit robbery and he should have anticipated that someone could die.*" This presented a false choice to the jury on the single most critical issue in the guilt-innocence phase, and it was not corrected by the court because there was no objection.

In sum, the Texas Court of Criminal Appeals' adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in the *Strickland* case.

2.     INEFFECTIVE ASSISTANCE OF COUNSEL -- FAILURE TO
       OBJECT TO JURY VENIRE THAT DID NOT REFLECT FAIR
       CROSS-SECTION OF THE COMMUNITY IN VIOLATION OF THE
       SIXTH AMENDMENT

<u>FACTUAL BACKGROUND</u>

Mr. Rivas' capital voir dire took place between June 25, 2001, and August 2, 2001, inclusive. At the beginning of voir dire, seven panels of sixty veniremen each were selected from the general jury pool. Two panels of sixty were taken on June 25, 2001, and addressed by the trial court as a group on that day. (5 RR 8-68) Two more panels of the same number were drawn the next day, on June 26, 2001, and similarly addressed. (6 RR 7-61) On June 27, 2001, two more panels were drawn. (7 RR 6-64)

On June 28, 2001, one more panel of sixty was drawn. (8 RR 6-35) When individual voir dire began, 420 prospective jurors had been selected for possible duty in Mr. Rivas' case. As voir dire progressed, that number proved insufficient. Therefore, two more panels of sixty were drawn before twelve jurors and two alternates could be chosen. On July 24, 2001, another panel of sixty was drawn and addressed by the court, and another a week later, on July 31, 2002. (20 RR 6-26; 24 RR 132-154) Thus, the total number of veniremen from which Mr. Rivas' jury was selected was 540.

Of those 540 prospective jurors, Hispanics and young adults were under-represented at a statistically significant rate. *See generally* Attachment 4, Affidavit

31

of Dr. Harold J. Hietala, & Accompanying Exhibits 1 through 14. Dr. Hietala has

calculated the percentage of Hispanics and young adults among the jurors in Mr.

Rivas' venire, giving every conceivable benefit of the doubt to *overstating* their

ultimate number. Using data from the 2000 census (which likely *understated* the

population of voting-age Hispanics for Dallas County as of June of 2001), Dr. Hietala

found that Hispanics made up 26.4% of the adult population in Dallas County, while

young adults made up 39.8% of the adult population. Attachment 4, Affidavit, at 9 &

11. By contrast, even by Dr. Hietala's most generous estimates (resolving all

possible doubt in favor of over-inclusion of Hispanic individuals), the proportion of

Mr. Rivas' venire that was Hispanic was only 10.9%, and the proportion of young

adults, at best, only 20.4%. *Id.,* at 12 & 16.

    Dr. Hietala used four different methods to measure the representation of

Hispanics and young adults in Mr. Rivas' venire. These methods are: absolute

disparity, absolute impact, comparative disparity, and SDT (statistical decision

theory). Attachment 4, Affidavit, at 16-18. The Supreme Court has most often used

absolute disparity in its analyses of under-representation. Ted M. Eades, *Revisiting*

*the Jury System in Texas: A Study of the Jury Pool in Dallas County,* 54 SMU L.

REV. 1813, 1822 (2001). Using that measure, Dr. Hietala obtained an absolute

disparity value of, at worst, 15.24% for Hispanics, and 19.3% for young adults. *See*

Attachment 4, Affidavit, at 18 & 23, 19 & 23, respectively. The Supreme Court has found an absolute disparity value of 14.7% sufficient to establish constitutionally unacceptable under-representation. Eades, supra, at 1824, & n. 87; *Jones v. Georgia*, 389 U.S. 24, 25 (1967). Perhaps an even more graphic measure of the under-representation in Mr. Rivas' case is the absolute impact. For while Mr. Rivas' venire included a maximum of 59 Hispanics, and 109 young adults, a perfectly representative venire would have included at least an additional 82 Hispanics, and an additional 104 young adults. Attachment 4, Affidavit, at 18 & 23, 19-20 & 23, respectively. Finally, the chance that such an under-representation of either Hispanics or young adults could have occurred randomly, utilizing the SDT measure, is less than one in ten million, or "negligible." *Id.,* at 18 & 23, 20 & 24, respectively.

## ARGUMENT

*The Legal Test*

In *Taylor v. Louisiana,* 419 U.S. 522, 537 (1975), the Supreme Court embraced "the view that the Sixth Amendment (applicable to the states through Fourteenth Amendment) affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community[.]" This does not mean that criminal defendants are "entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not

systematically exclude distinctive groups in the community and thereby fail to be

reasonably representative thereof." *Id.,* at 538 (citation omitted). A few years later,

the Supreme Court fashioned a three part test for determining a *prima facie* violation

of this Sixth Amendment right, *viz:*

> The defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364 (1979).

" 'Once the defendant has made a prima facie showing of an infringement of

his constitutional right to a jury drawn from a fair cross section of the community,'

the burden shifts to the State to 'justify[] this infringement by showing attainment of

a fair cross section to be incompatible with a significant state interest.'" Eades, *supra*

at 1821 (2001), *quoting Duren v. Missouri, supra,* at 368. The unlawful exclusion of

members of a particular race from the venire from which a jury is selected is not

subject to a harmless error analysis because it is of the type of enumerated errors set

out by the United States Supreme Court as being "structural," resulting in automatic

reversal because they infect the entire trial process. *Vasquez v. Hillery,* 474 U.S. 245,

at 263-264 (1986); *Arizona v. Fulminante,* 499 U.S. 279, at 294 (1991).

*Distinctive Class*

There is no question that persons of Hispanic origin constitute a distinctive

group in the community. *See Castaneda v. Partida*, 430 U.S. 482, 495 (1977) ("it is

no longer open to dispute that Mexican-Americans are a clearly identifiable class[,]"

*citing Hernandez v. Texas*, 347 U.S. 475, 479-480 (1954), in which the Supreme

Court held that the petitioner's initial burden in substantiating his charge of group

discrimination was to prove that persons of Mexican descent constitute a separate

class in Jackson County, distinct  from "whites". . . it must be concluded that

petitioner succeeded in his proof"); *see also Aldrich v. State*, 928 S.W. 2d 558 (Tex.

Cr. App. 1996) ("Hispanics are a distinct group in any community...."); *United States

v. Weaver,* 267 F.3d 231 (3d Cir. 2001) (Hispanics are a "distinctive group for

purposes of fair cross-section analysis); *United States v. Lara*, 181 F. 3d 183, 192 (1st

Cir. 1999) ("Hispanics comprise a distinctive group that meets the cognizability

requirement.")

The exclusion of persons between the ages of 18-34, likewise, constitutes a

distinct group whose exclusion is constitutionally prohibited. *Thiel v. Southern Pac.

Co.*, 328 U.S. 217, 220 (1946) ("prospective jurors shall be selected by court officials

without systematic and intentional exclusions of any of these [economic, social,

religious, racial, political, and geographical] groups.") *See generally Olmstead v.*

*L.C. ex rel. Zimring,* 527 U.S. 581 (1999) (recognizing a protected class on the basis of age and prohibition against discrimination on the basis of age); *O'Connor v. Consolidated Coin Cateres Corp.,* 517 U.S. 308 (1996) (clarifying that federal statute does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older).

### Under-Representation of Hispanics & Young Adults in Dallas County Venires

The degree of under-representation of Hispanics and young adults is not unique to Applicant's case. In his analysis of the jury pool in Dallas County, Ted Eades, Esq., described a study done by the Dallas Morning News based on juror summonses for the week of March 6, 2000. Eades, *supra.* The sum and substance of the study established that in the March, 6, 2000 time frame, which is approximately sixteen months prior to Mr. Rivas' jury selection and trial, there was a substantial under-representation in the venire of Hispanic Americans and young adults. *Id.*, at 1815. In particular, the study found that "Hispanic Americans represent 23% of the population in Dallas County, but only 9% of the venire[,]" and that "[t]hirty-seven percent of Dallas adults are between the ages of 18 and 34, but only 8% of the prospective jurors are in that age group." *Id.* The study concluded that "the Dallas County jury system is primed for a constitutional challenge. Although the intent of

36

the officials operating the jury wheel may not be to discriminate, the reality is that at least two distinct groups are being excluded from the weekly venire." *Id.*

A detailed statistical analysis also demonstrated that the venire from which another recent Dallas County capital jury was chosen (*Rayford v. State*, cause number F0-01529-IH, Dallas County, Texas), was in fact significantly under-representative of both Hispanics and young adults. *See* Attachment 4, Affidavit, at 19 & 20 and Exhibits 14b & 14d. Dr. Hietala found that in the Rayford venire, which was summoned in August of 2000, some eleven months before Applicant's trial, Hispanics and young adults were under-represented by an even slightly greater extent that in Applicant's venire, utilizing the same four measurements of under-representation. *Id.* Dr. Hietala summarizes: "The Rivas case, Rayford case and SMU/DMN studies all show that [Hispanics and young adults] are demonstrably under-represented over a period of time spanning nearly one and a half years." *Id.,* at 19 & 20. He found in Mr. Rivas' case, Rayford's case, and in evaluating the data from the SMU/DMN study, that the chance that such under-representation could have been the result of random occurrence is statistically "negligible." "All statistical tests revealed that the probability that any of these results was due to chance was less than one in ten million." There can be no doubt that during the time period between March of 2000 and July of 2001, if not more, the venires in Dallas County from which juries

37

were actually chosen did not include a fair representation of either Hispanics or young adults, and that the problem was not he results of happenstance, but of an inherent flaw in the jury selection system.

### Systematic Exclusion

Dallas County Jury Services Manager Donna Roach testified at a pre-trial hearing in Dallas County on November 13, 2000, in cause numbers and in the case of State v. Johnny Frank Benton, in the 292nd Judicial District Court. See Attachment 5, Affidavit of Donna Roach & Transcript of Testimony. There, she identified two deficiencies in the system design that cause juror no-shows. One was the low daily pay for jury service, six dollars a day, which is barely enough to cover the cost of parking. More telling is Roach's testimony with respect to the second deficiency:

"Q    When someone fails to report without any explanation, what steps are taken to enforce the summons?

A.    At this time, nothing."

Id., Testimony at 5. This testimony remained accurate at least through November of 2002, more than a year after Applicant's jury was chosen. See Attachment 5, Affidavit of Donna Roach: "From the date I was hired, April 9, 1996, to the present, there is no uniform and consistent overall enforcement when persons choose to ignore a jury summons.

As the SMU study concluded:

38

> An examination for the weekly venire will show that juries
> in Dallas County are not drawn from a cross-section of the
> community. Something in the system is inherently wrong,
> and is excluding distinct groups from the venire. The rules
> in Texas, such as paying jurors only $6 per day, make it so
> financially onerous that low income people [a
> disproportionate number of whom are Hispanic] cannot
> afford to fulfill their civic duty.

Eades, *supra*, at 1826. Dr. Hietala's statistical analysis in both the *Rayford* case, and now in Applicant's case, bears out this assessment. Both Hispanics and young adults are demonstrably under-represented in Dallas County juries, at least for the significant period of time between March of 2000, when the SMU study was conducted, and June and July of 2001, when Mr. Rivas' jury was selected.[9]

At issue for purposes of the Sixth Amendment *Duren* test is whether the under-representation of Hispanics and young adults "is due to systematic exclusion of the group in jury-selection process." *Duren, supra*, at 36. There is systematic exclusion, the direct cause of which is directly attributable to the State of Texas and the County of Dallas County's failure to enforce its jury summons. On first consideration, one might assume systematic exclusion to be synonymous with a jury selection process which engages in intentional discrimination, but such is not the case. A defendant need not show purposeful discrimination; he need only show that the jury selection

---

[9]Even under current Texas law, jury compensation rates remain low: effective January 1, 2006, jurors must be paid "not less than $6" for the first day and "not less than $40" after the first day of jury service. *See* Tex. Gov't Code § 61.001 (2006)

procedure systematically exclude[s] distinctive groups in the community and thereby fail[s] to be reasonable representative thereof. *Castanada v. Partida,* 430 U.S. 482 (1977).

An alternative method (apart from enforcing jury summonses) of insuring a fair cross-section would have been for the county to reasonably compensate jurors for their service. (*See* footnote 4, *supra* p. 35)  Officials are under a duty to ensure that everyone is entitled to a jury drawn from a cross-section of society, yet the design of the system results in large numbers of people, disproportionately Hispanics and those between the ages of 18-34 years of age, to stay home rather than report for jury service.

*Ineffective Assistance of Counsel*

The above-discussed defects and shortcomings of the Dallas County system were not raised by trial counsel.  Should this court find that the system violated Mr. Rivas' jury trial rights, it should also make a finding of ineffective assistance of counsel, under the tests set out in *Strickland v. Washington*, discussed *infra*, for its failure to object to the venires, and consider that claim along with his other Sixth Amendment assertions of ineffectiveness herein.

Trial counsel should have been alerted to the possibility of raising such a claim. The Dallas Morning News had run a series of articles in October of 2000, some eight

40

months before Applicant's jury selection began, raising the specter of under-representation of Hispanics and young adults in the Dallas County jury selection process. *See,* in Attachment 6, Dallas Morning News, "A POOR REFLECTION: Number of minority, lower income jurors doesn't mirror county population," Sunday, October 22, 2000; "DUTY CALLS, FEW ANSWER: County must fill juries, but many people don't show up or say they can't make it," Monday, October 23, 2000; "NO EXCUSES: New Yorkers who try to avoid jury duty find that system has gotten serious about service," Tuesday, October 24, 2000; "Extra money helps El Paso lure more prospective jurors, County success may spur legislature to raise statewide pay rate," Tuesday, October 24, 2000.  Should the court find that, on account of such publicity, Mr. Rivas' attorneys should have been poised to make a constitutional challenge to the under representation in Mr. Rivas' own venire, then it should hold them accountable for not being ready. There was no conceivable strategic reason for failing to raise the issue.

In adjudicating this issue, raised by Mr. Rivas in his state writ application, the Texas Court of Criminal Appeals again adopted the state's proposed findings of fact and reasoned that

> the Supreme Court has never required the venire to be, statistically, a substantially true mirror of the community, and courts allow a fair degree of leeway to States, in designating jurors, so long as it does not actively prevent

41

people from serving or actively discriminate, and so long
as the system is reasonably open to all[,]

citing *Barber v. Ponte*, 772 F.2d 982, 997-998 (1ˢᵗ Cir. 1985).  See Attachment 3,

paragraph 38. Mr. Rivas has never expected or demanded the "substantially true

mirror" rejected by the *Barber* court.  He demands instead that which is guaranteed

by the Constitution as informed by *Castaneda* and *Duren*, the latter finding that:

> Petitioner demonstrated that the under-representation of
> women in the final pool of prospective jurors was due to
> the operation of Missouri's exemption criteria – whether
> the automatic exemption for women or other statutory
> exemptions – as implemented in Jackson County. Women
> were therefore systematically under-represented within the
> meaning of *Taylor*.[10]

*Duren*, supra at 367.  Thus, the state's scheme for insuring a fair cross section

condemned by the *Duren* court did not "actively prevent people from serving or

actively discriminating."  Like the Dallas County scheme, it *passively* allowed an

unacceptable portion of an identified class to simply opt out of jury service:  In

*Duren*, women opted out by exercising a statutory (but unconstitutional) exemption;

---

[10]*Taylor* v. *Louisiana*, 419 U.S. 522 (1975), holding that systematic exclusion of women
during the jury-selection process, resulting in jury pools not "reasonably representative" of the
community, denies a criminal defendant his right, under the Sixth and Fourteenth Amendments, to
a petit jury selected from a fair cross section of the community.

in Mr. Rivas' case, Hispanics and the young[11] opted out by not showing up. In neither case did the state purposefully discriminate as one might expect the test to require. In both cases the states were complicit, invidiously or not, in the systematic exclsuion of identified classes.

The Court of Criminal Appeals rejection of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Duren* and *Castaneda*.

---

[11]Mr. Rivas concedes that "18 to 34 years olds" have been specifically rejected as a distinctive group in *Barber,* 772 F.2d at 996-1000 (1st Cir. 1985).

**B. Constitutional Violations at Punishment Phase**

1.   VIOLATION OF DUE PROCESS -- IMPROPER EXPERT
     TESTIMONY ON FUTURE DANGEROUSNESS

**FACTUAL BACKGROUND**

In the punishment phase, the State introduced testimony from a psychiatrist,

Richard E. Coons, regarding Mr. Rivas' future dangerousness. In a *sub rosa* hearing,

Coons admitted that he had not consulted with any other experts in his field regarding

his future dangerousness opinion in the case, nor did he indicate that any of his

opinions regarding future dangerousness had ever been subject to follow-up studies

or to peer review. (41 RR 11-12) He cited no scientific articles or studies related to

predictions of future dangerousness.  (41 RR 9-18) In fact, studies related to future

dangerousness were largely focused upon predicting future dangerousness in

psychiatric patients with specific mental disorders, and results of those studies were

at best "conflicted." (41 RR 12-13)  Coons had never done any follow up studies or

simple research to determine whether previous predictions as to future danger turned

out to have been accurate. (41 RR 16-17) Therefore, his opinions had an unknown

rate of error. (41 RR 16)  Finally, Coons never personally interviewed Mr. Rivas. (41

RR 10).

Mr. Rivas' attorneys objected to the proffered testimony on the basis that Coons' opinions did not meet any requirement for scientific reliability. (41 RR 18-20) The trial court overruled the objections and allowed the testimony. (41 RR 21)

Coons then testified before the jury that in rendering opinions, he first determines whether the person has an active mental illness. If not, he then looks to the person's history of violence. He additionally looks to the facts of a particular case, and whether an individual has a pattern of violent behavior. He also looks to personality and behavior pattern. (41 RR 26-27)

Additionally, Coons stated that he tries to assess conscience, and whether the subject feels badly about doing things that are wrong. (41 RR 27) Finally, Coons looks to the person's "society," meaning, if they are going to be in the penitentiary, whether they are going to be on death row or not. (41 RR 28) Coons believed that death row inmates control their behavior reasonably well in the event they are granted a new trial. Nevertheless, there are those on death row who do not control their behavior, and need to be "locked down," that is, placed in administrative segregation from the other inmates. (41 RR 28)

Based on a lengthy hypothetical tracking many of the facts of this case, including extraneous offenses, Coons gave his opinion that there was a probability that Mr. Rivas would commit criminal acts of violence constituting a continuing

45