threat to society. (41 RR 35-48) Coons further testified that Mr. Rivas did not have

a conscience and could not be rehabilitated. Although he never examined Mr. Rivas,

Coons believed that Mr. Rivas was not suffering from any mental disease "that [he

could] tell." (41 RR 52-53.)

## ARGUMENT

In 1993, the Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals*,

Inc. 509 U.S. 579 (1993). This case articulated a new test for the admissibility of

expert testimony in federal civil cases and voiced a concern in the Court for reliability

in expert testimony. Despite the fact that the *Daubert* discussion of reliability in

expert testimony was in the context of a federal civil case, its standard of reliability

should be a model for death penalty determinations. If the Court now requires that

expert testimony in civil cases survive a particular determination of reliability to

assess admissibility, it only follows that in the far more serious context of death

penalty determinations, psychiatric expert testimony should at a bare minimum have

to meet the Court's *Daubert* standard. This seems especially necessary considering

the Court's requirement that evidence admitted in death penalty sentencing hearings

be particularly reliable.

The *Daubert* Court suggested the following four factors to be considered in

assessing the reliability of expert testimony:

46

(1) Whether a "theory or technique ... can be (and has been) tested";

(2) Whether the theory or technique "has been subjected to peer review and publication";

(3) Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

(4) Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Id.* at 594.

*Daubert* clearly established that "general acceptance" was no longer the standard, as it had been under *Frye v. United States*, 293 F. 1013 (App. D.C. 1923) for the admission of scientific expert testimony.  It remained unclear, however, whether *Daubert* applied to all experts or just to scientific experts. This issue was resolved by the Supreme Court's decision in *Kuhmo Tire Company, Ltd., v. Carmichael*, 119 S.Ct. 1167 (1999), which erased lingering doubts about whether "technical" expert testimony and "scientific" expert testimony are subject to the same standards of admissibility in federal court. *Kuhmo Tire* held that *Daubert* applied to all expert testimony and that the trial court did not abuse its discretion by applying *Daubert* to exclude the testimony of a tire failure analyst.  The Court also noted that the four factors suggested in Daubert were factors that "may" be used by the trial judge in carrying out its gate-keeping requirement. *Id.* at 1175. The *Kuhmo* Court

emphasized that the trial judge was not required to use each factor in making its

decision:

> To say this is not to deny the importance of *Daubert*'s gate-keeping requirement. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert*, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

*Id*. at 1176.

Returning to Mr. Rivas' trial, it is clear that expert predictions of future

dangerousness fail the *Daubert* factors which test the reliability of such testimony.[12]

Expert testimony with regard to future dangerousness can and has been tested; it has

been revealed as unreliable for years. *(See infra.)* Such predictions have been subject

to peer review and the reviews are virtually all negative. The American Psychiatric

---

[12]*See* G. Michael Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny,* 29 Creighton L. Rev. 939, 974 (1996).

Association has condemned psychiatric predictions of future dangerousness as inaccurate and unreliable. Future dangerousness predictions have been estimated to have a failure rate of anywhere from two out of three to one out of two predictions. This rate of error suggests that there are not sufficient standards controlling the methods of prediction.

As Justice Blackmun, joined by Justices Brennan and Marshall, wrote in his dissenting opinion in *Barefoot v. Estelle*, 463 U.S. 880, 916 (1983),

> [T]he court holds that psychiatric testimony about a defendant's future dangerousness is admissible, despite the fact that such testimony is wrong two times out of three. The court reaches this result – even in capital cases – because, it is said, the testimony is subject to cross-examination and impeachment. In the present state of psychiatric knowledge, this is too much for me. One may accept this in a routine lawsuit for money damages, but when a person's life is at stake – no matter how heinous his offense – a requirement of greater reliability should prevail. In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a mental specialist's words, equates with death itself.
> . . . .
>
> The American Psychiatric Association (APA), participating in this case as amicus curiae, informs us that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now and established fact within the profession." Brief for American Psychiatric Association, as *Amicus Curiae,* 12 (APA Brief). The APA's best estimate is that two out of three predictions of long-term future violence made by psychiatrists are wrong. *Id.*, at 9, 13. The

49

> Court does not dispute this proposition, see *ante*, at 18-19, n.7, and indeed it could not do so; the evidence is overwhelming. For example, the APA's Draft Report of the Task Force on the Role of Psychiatry in the Sentencing Process (Draft Report) states that "[c]onsiderable evidence has been accumulated by now to demonstrate that long-term prediction by psychiatrists of future violence is an extremely inaccurate process." Draft Report 29.

463 U.S. at 916.

Although the failure of one or two *Daubert* factors is not dispositive, the Court's reasoning suggests that the failure of every single factor would lead to a finding of unreliability and, therefore, inadmissibility.

The standard for showing that the admission of evidence violated a specific constitutional guarantee is not whether the testimony satisfied the *Daubert* test, but "rather whether the probative value of the state's evidence was so greatly outweighed by its prejudice to [the defendant] that its admission denied him a fundamentally fair trial." *Milone v. Camp*, 22 F.3d 693 (7th Cir. 1994).

This Court should follow a path toward the finding that psychiatric predictions of future dangerousness in capital cases are a violation of the Eighth Amendment

because they are unreliable and inaccurate and lead to arbitrary and capricious results.[13]

Due process protections in the Constitution require that statutory aggravating circumstances genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a death sentence. *Godfrey v. Georgia*, 466 U.S. 420 (1980). The Texas special issues perform the function of narrowing the class of death eligible defendants' and thereby constitute aggravating circumstances under the Constitution. The dramatic effect of "expert" testimony impacts the process in which the class of death-eligible defendants is determined, thereby implicating the constitutional right of due process. Mr. Rivas' rights to due process were affected, and since the objectionable testimony came in the guise of expert testimony, it cannot be said that the error did not contribute to the death sentence.

---

[13]Mr. Rivas recognizes that the Fifth Circuit has stated that "[T]he appropriate standard regarding the admissibility of evidence at sentencing is substantially lower than that governing admissibility at trial. Specifically, '[i]n resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant evidence without regard to its admissibility under the rules of evidence at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.' Thus, the test for the admission of scientific evidence at the sentencing phase is 'sufficient indicia of reliability to support [the evidence's] probable accuracy. *Daubert* is not the test (and neither is *Frye*)." *United States. v. McCaskey*, 9 F.3d 368 (5th Cir. 1993). Mr. Rivas notes first that *McCaskey* involved a simple challenge to the admissibility, under the Federal Rules of Evidence at a federal sentencing, of scientific testimony concerning the identity (cocaine versus cocaine base) of drugs that were the subject of the defendant's offense. The defendant there apparently made no due process challenge to the trial court's ruling permitting the introduction of the evidence. Nor did the Fifth Circuit's decision address the constitutional dimension of the issue. Moreover, *McCaskey* notwithstanding, expert opinion as to future dangerousness should satisfy *Daubert* at a *minimum* in all capital cases.

In rejecting this claim, the Texas Court of Criminal Appeals invoked the rule of *Weatherred v. State*, 15 S.W. 3d 540, 542 (Tex. Crim. App. 2000) and accordingly considered only whether the state showed the testimony of Dr. Coons was "relevant and reliable." *See* Attachment 1, page 7. It gave no consideration to the *Daubert* tests, announced in 1993, and deferred instead to the *Barefoot v. Estelle* decision from 1983.

The Court of Criminal Appeals rejection of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals and Kuhmo Tire.*

2.   INEFFECTIVE ASSISTANCE OF COUNSEL -- FAILURE TO OBJECT TO PROSECUTOR'S READING OF OUT-OF-COURT STATEMENTS BY CO-DEFENDANTS

## **FACTUAL BACKGROUND**

In his confession and in his testimony at the punishment phase of the trial, Mr. Rivas maintained that he had not intended to kill the victim, but rather had shot him twice in the areas of his arms and chest believing that the victim was wearing a bullet proof vest, this with the intent to subdue the victim so that he could make his getaway. (43 RR 67-70, 76-77, 98, 103-104, 106-107, 116; 45 RR SX-1) He also testified that, after suffering two gunshot wounds himself, he fired three more times into the driver's side window of the officer's car. In his testimony, Mr. Rivas took responsibility for the death of Officer Hawkins. (43 RR 96; 44 RR 28-30) Mr. Rivas' first two (of five total) shots were aimed at the victim's shoulders (43 RR 67-70). When he fired the final three shots, which entered the victim's driver's side window, he had himself already been shot twice. When he fired these last three shots he "was not aiming" (43 RR 105) and "had just gotten shot [and so] I am thinking I am getting shot by him too." (43 RR 111) He further testified that he never wanted to hurt

anyone at Oshman's (43 RR 116), that "there was no way" he was going to kill Officer Hawkins (43 RR 116), and that he did not try to kill Officer Hawkins. [14]

On cross-examination, the prosecutor challenged this version of the events and of Mr. Rivas' intent by reading a portion of co-defendant Randy Halprin's statement to the police in an attempt to establish that Halprin was in a position to see Mr. Rivas shoot the victim. (43 RR 109) The prosecutor next read to the jury the portion of Halprin's statement in which he asserts that Mr. Rivas "went up and shot the cop four times[,]" this tending to indicate that applicant had shot not in an attempt to subdue, but rather to "execute" Officer Hawkins. (43 RR 110) In this way, the State was able to discredit Mr. Rivas' account that he lacked any specific intent to kill.

In the same manner, the prosecutor essentially testified that, according to the statement of co-defendant Murphy, the robbers had brought a high-powered rifle and a shotgun, both taken during the escape from the prison, along with them in the lookout vehicle at the Oshman's robbery, and that Murphy's job would be to initiate a "firefight" with the police. (43 RR 117-123) The prosecutor argued that this indicated a manifest intent to "hurt [somebody] out there that day."

---

[14]     Q. "Were you trying to kill Aubrey Hawkins?"
         A. "God, no. No." (43 RR 103)

(43 RR 115, 117) And finally, contrary to Mr. Rivas' assertion that their motive had been purely monetary, the prosecutor read to Mr. Rivas a portion of co-defendant Rodriguez's statement to police, this indicating that the reason for robbing the Oshman's store had been to obtain firearms. (43 RR 124-125)

Neither Halprin nor Murphy nor Rodriguez testified at the trial; nor were their statements to the police otherwise introduced into evidence by either party at any stage of the proceedings. All the jury heard from them was the particular, un-cross-examined portions of their statements the prosecutor read or paraphrased. *See* Attachment 4, Custodial Statements of Halprin, Murphy, and Rodriguez. Together and singly, these portions of the co-defendants' statements had a critical bearing on the jury's resolution of the second special issue at punishment, that is, whether Mr. Rivas actually caused the death of the victim, or at least anticipated that a life would be taken, as contemplated by Article 37.071, Section 2(b)(2) of the Texas Code of Criminal Procedure.  (1 CR 264) During his final argument at punishment, the prosecutor emphasized that these out-of-court assertions demonstrated that Mr. Rivas not only anticipated, but even made it part of his plan, that any police officer who happened on the scene that day would die. (44 RR 96-97)

55

# ARGUMENT

*Hearsay*[15]

Out-of-court statements offered for the truth of the matters asserted are objectionable in Texas, but will not be denied probative value if no objection is made. Tex.R. Evid. Rules 801, 802 & 803. By reading or paraphrasing portions of the statements of Mr. Rivas' co-defendants, the prosecutor introduced out-of-court assertions to rebut the assertion Mr. Rivas was making in his own testimony at the punishment phase. These out-of-court assertions did not qualify as non-hearsay, by virtue of Rule 801 (e)(2)(E), because they were made during custodial interrogation, and thus could not have come "during the course of and in furtherance of [any] conspiracy." "Coconspirator's statements made after the termination of the conspiracy are inadmissible." *Deeb v. State,* 815 S.W.2d 692, 696 (Tex.Cr.App. 1991). Finally, Mr. Rivas notes that the documents containing the statements were never entered into evidence. In failing to object to those out-of-court assertions (or at least to request a limiting instruction that the jury limit its consideration of those assertions to whatever relevance they had *apart from* the truth of the matters asserted), Mr. Rivas' trial counsel assured that the jury would be allowed to consider those out-of-court

---

[15]This portion of the argument is to point up the ineffectiveness of counsel in failing to object to hearsay, not the mere violation of state law.

assertions for all purposes, including deliberating upon the second special punishment issue.

There is no rule that would have permitted the introduction of the out-of-court statements over a timely and specific objection. None of the assertions could qualify as a statement against penal interest, under Rule 803 (24). For, while portions of the custodial statements of Halprin, Murphy, and Rodriguez are undoubtedly self-inculpatory, Rule 803 (24) has been construed to prohibit "the admission of non-self-inculpatory statements even if made within a broader narrative that is generally self-inculpatory." *Cofield v. State*, 891 S.W.2d 952, 956 (Tex. Cr. App. 1994), quoting from and adopting federal construction of the comparable federal rule in *Williamson v. United States,* 512 U.S. 594 (1994). To be admissible under Rule 803 (24), moreover, "corroborating circumstances [must] clearly indicate the trustworthiness of the statement." Statements made by co-defendants in the setting of a custodial interrogation have been said to lack the requisitely "clear" indication of trustworthiness. As the Austin Court of Appeals recently observed:

> Custodial confessions are highly suspect for several reasons. The declarant knows that anything he says can be used against him in a court of law. However, by cooperating with the authorities, he may plea bargain for a lesser charge or lighter sentence, or escape prosecution altogether. For this reason, the declarant is highly motivated to minimize his own culpability.

*Mendez v. State,* 56 S.W.3d. 880, 891 (Tex.App. - Austin, 2001, pet. ref'd). For these reasons the *Mendez* court held that the statement of a co-defendant given in the context of a custodial interrogation was insufficiently reliable to meet the dictates of Rule 803 (24), just as the Supreme Court has construed such statements to be presumptively unreliable for purposes of a Sixth Amendment Confrontation Clause analysis.

None of the portions the prosecutor read from the statements of Mr. Rivas' co-defendants was admissible under Rule 803 (24). All were presumptively unreliable because they occurred in the course of custodial interrogation. Particularly unreliable was the statement the prosecutor attributed to Halprin, asserting that Mr. Rivas "went up and shot the cop four times[.]" (43 RR 110) As the Supreme Court noted in construing the federal analog to Rule 803 (24):

"Due to his strong motivation to implicate the defendant and to exonerate himself, a co-defendant's statements about what the defendant said or did are less credible than ordinary hearsay." *Williamson v. United States, supra*, at 601, quoting *Lee v. Illinois,* 476 U.S. 530, 541 (1986). Halprin had every reason to want the police to believe that he did not personally shoot Officer Hawkins, or even have reason to anticipate that he would be shot. It was in his own interest to convince police that events transpired too quickly for him to have anticipated a killing, and thus to detail

a story that was at odds with Mr. Rivas' own version of events whereby Mr. Rivas denied having harbored any specific intent to kill, or even having actually anticipated that a human life would be taken, as required to justify a death sentence under Article 37.071, Section 2 (b) (2). This selective portion of Halprin's statement inculpates Mr. Rivas to the fullest, but inculpates Halprin not at all. It would never have been admitted over a timely and specific hearsay objection.

### *Confrontation*

The United States Supreme Court has long held that the admission of the confession of a non-testifying co-defendant in a state prosecution may deny the accused the right to cross-examine witnesses against him guaranteed by the Sixth Amendment Confrontation Clause. *Douglas v. Alabama,* 380 U.S. 415 (1965). Twenty years after *Douglas,* in *Lee v. Illinois,* supra, at 541, the Supreme Court observed that "[o]ur cases recognize that [the] truth-finding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." *Douglas,* as the Court observed in *Lee,* " was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is

presumptively suspect and must be subjected to the scrutiny of cross-examination."
*Id.*

In *Lilly v. Virginia,* 527 U.S. 116 (1999), the Supreme Court revisited the question whether the statement for a non-testifying co-defendant could be admitted into evidence consistent with the Confrontation Clause. The Court acknowledged that not all hearsay statements would violate confrontation principles, and it "adhered to our general framework . . . that the veracity of hearsay statements is sufficiently dependable to allow untested admission of such statements against an accused when (1) the evidence falls within a firmly rooted hearsay exception; or (2) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability. *Id.*, at 124-125 (internal quotations omitted). As to the first, the *Lilly* Court categorically held, after surveying *Douglas, Lee,* and other cases, "that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.*, at 134. Turning to the second, the Court fell back upon the *Lee* presumption of unreliability of an accomplice confession, especially when taken in the custodial interrogation setting. The Court observed:

> It is highly unlikely that the presumptive unreliability that
> attaches to accomplices' confessions that shift or spread

> blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice – that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Id.,* at 137. The Court further noted that it is "irrelevant" to a Sixth Amendment analysis whether or not other evidence at trial corroborated the custodial statement; nor does the fact that the statement followed a proper *Miranda* warning make any difference. *Id.,* at 137 & 138.

In short, nothing about the typical custodial setting provides any basis to believe that an accomplice's statement implicating a co-defendant criminal would be "so inherently reliable that cross-examination would be superfluous." *Id.,* at 139.

All of this Sixth Amendment jurisprudence was in place at the time of Mr. Rivas' trial, and so counsel's omission fell below an objective standard of reasonableness. His trial counsel should have objected on confrontation grounds as well when the prosecutor read portions of three non-testifying co-defendants statements to the jury during Mr. Rivas' testimony.[16]

The most egregious example was the assertion read from Halprin's statement that Mr. Rivas "went up and shot the cop four times[.]" (43 RR 110) Mr. Rivas was

---

[16]For an example of ineffectiveness of counsel for his failure to follow state law, see *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).

unable to cross-examine Halprin, to test whether those shots came in quick succession (as the assertion on its face seems to imply, and the prosecutor obviously wanted the jury to believe), contrary to Mr. Rivas' own testimony. And it was certainly to the benefit of all co-defendants, including Murphy and Rodriguez, to portray Mr. Rivas as the mastermind of the whole event, since to that extent their own culpability is "minimized." None of their statements would have been admitted had Mr. Rivas' trial counsel made a proper and timely objection under the Confrontation Clause.[17]

*Prejudice*

Trial counsel's mistake had a critical impact on the outcome of the jury's punishment verdict. For even if the evidence was overwhelming to establish that Mr. Rivas would probably commit criminal acts of violence in the future that would constitute a continuing threat to society, and even if the mitigating evidence was

---

[17]So that the issue is preserved for further review, Mr. Rivas also specifically relies on the confrontation rule announced in *Crawford v. Washington*, 541 U.S. 36 (2004), which held that testimonial, out-of-court statements are inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness about the statement. *Crawford* was decided after Mr. Rivas' trial but before, of course, full exhaustion of all Mr. Rivas' appellate and habeas remedies. The Fifth Circuit has specifically declined to apply *Crawford* retroactively to cases on collateral review:"T he rule announced in *Crawford* does not implicate the fundamental fairness and accuracy of criminal proceedings. While it may implicate the core of the confrontation right, it is not a rule without which there is an impermissibly high risk of false conviction. In so holding, we join the majority of other circuits that have held or suggested that *Crawford* should not be applied retroactively." *Lave v. Dretke*, 444 F.3d 333 (5th Cir. 2006) (citations omitted). Mr. Rivas expects that the Supreme Court will resolve a split in the circuits on this issue (*see Bockting v. Bayer*, 399 F.3d 1010 (9th Cir. 2005)), and he believes that the split should be resolved in Mr. Rivas' favor. Certiorari has been granted in *Bockting* case and oral arguments were held November 1, 2006.

sufficient to warrant a life sentence, the trial court could still not impose the death penalty without a jury finding that Mr. Rivas either specifically intended, or at least anticipated in fact that Officer Hawkins could be killed. *See* Article 37.071, Sections 2(b)(1) & (2), (d), and (g), Texas Code of Criminal Procedure. The evidence at trial did not establish which of the co-defendants' weapons fired the fatal shots. Therefore, there was no definitive evidence that it was Mr. Rivas who actually caused the victim's death. By his confession and trial testimony at the punishment phase, Mr. Rivas denied any specific intent to kill, and by inference, the jury could have found, in light of Mr. Rivas' assertions that he only meant to disable Hawkins, that he did not actually anticipate that anyone would be killed either. "The first thing I thought, I am going to get down and put handcuffs on him, actually. Once I was going to get close enough." (43 RR 67); *see also* (33 RR 192) "I knew the rounds I had in the gun would not go through a ballistic vest. Believe it or not, I was praying he would raise his hands." (45 RR SX-1) Crediting these assertions, the jury would have been amply justified in answering the second special issue "no," thus resulting in a life sentence.

The prosecutor's injection of the out-of-court assertions of the co-defendants was manifestly designed to counter Mr. Rivas' assertions that he neither intended nor anticipated Hawkins' death. Halprin's assertions were particularly meant to undercut Mr. Rivas' claims that he intended only to disable the officer, inasmuch as the

63

assertions imply that Mr. Rivas "executed" Officer Hawkins. The assertions of Rodriguez and Murphy were quoted by the prosecutor in an attempt to tap into the common (if not necessarily invariably accurate) assumption that anyone who would either steal a weapon or take it with him to commit a robbery necessarily intends or anticipates its use to fatal effect. All of the non-testifying co-defendants' out-of-court assertions were thus highly damaging to Mr. Rivas' defense on guilt and punishment issues. The prosecutor made it a point to remind the jury of that fact during his punishment summation. (44 RR 96-97)

But for the mention of the out-of-court assertions of Halprin, Rodriguez, and Murphy, there is a reasonable probability the jury would have returned a negative answer to the second special punishment issue – or at least that one juror would have balked at returning an affirmative finding, thus resulting in a life sentence. Article 37.071, Section 2 (g) *supra*.   None of the circumstantial evidence in the case provided the jury with a compelling reason to disbelieve Mr. Rivas' account, which was not inconsistent with the State's circumstantial evidence in the case. Indeed, an intent to subdue rather than cause the death of Hawkins could have been readily inferred from the abundance of evidence that Mr. Rivas had never before harmed any of his earlier (and many) robbery or kidnap victims, was in fact polite and considerate of his victims, even though he had invariable carried a weapon with him on those

prior occasions. (34 RR 108; 36 RR 95-100; 37 RR 108; 38 RR 6-7, 26-30, 39 RR 59-62, 69-71, 105-106; 40 RR 30-31, 47-51; 41 RR 100-108; 42 RR 75-76, 81-82, 86, 103; 43 RR 30-31, 56, 149-150, 159; 44 RR 30)

The out-of-court assertions of Halprin, Rodriguez, and Murphy provided the jury with a concrete reason to believe that on this particular occasion, Mr. Rivas behaved contrary to his usual character and either intended or at least anticipated that any intruding police officer would be killed. The prosecutor pointedly reminded the jurors of this during his summation. There is at least a reasonable probability (it need not rise to the level of by a preponderance) that without this objectionable evidence, or at least if the scope of the evidence had been limited to whatever legitimate purpose it may have served apart from truth of the matters asserted, the jury would not have returned a verdict requiring the imposition of the death sentence.

The Texas Court of Criminal Appeals denied this claim, raised in the state writ application, noting that the constitutional test for admissibility of hearsay was governed at the time of trial, not by *Crawford's* confrontation analysis, but by the "firmly-rooted" hearsay exceptions and/or "particularized guarantees of trustworthiness" tests of *Ohio v. Roberts*, 448 U.S. 56 (1980). *See* Attachment 1, pages 56-57. At footnote 15, supra p. 61, Mr. Rivas acknowledges that *Lave v. Dretke* declined to apply *Crawford* retroactively to cases under collateral review on

the grounds that *"Crawford* does not implicate the fundamental fairness and accuracy of criminal proceedings. While it may implicate the core of the confrontation right, it is not a rule without which there is an impermissibly high risk of false conviction." *Lave*, 444 F.3d at 339. Mr. Rivas respectfully suggests that the Supreme Court will disagree with the Fifth Circuit in its prospective decision in *Bockting, supra* note 15. If Crawford implicates the core of the confrontation right, and it assuredly does, it follows that it *is* a rule without which there is an impermissibly high risk of false conviction. Mr. Rivas is therefore constitutionally entitled to a new punishment hearing.

3.   CRUEL AND UNUSUAL PUNISHMENT -- MANNER OF EXECUTION IN TEXAS VIOLATES EIGHTH AMENDMENT GUARANTEES

The mixture of drugs that will be used to execute the Mr. Rivas will cause extreme pain and suffering and the prospective execution violates Eighth Amendment guarantees.[18]

## FACTUAL BACKGROUND

According to public information available from the Texas Department of Criminal Justice, when a person is executed in Texas, sodium thiopental is given first for the purpose of sedating the inmate. The second of the three drugs given in a lethal injection is pancuronium bromide, this to relax muscles and collapse the diaphragm and lungs.  The last chemical in the three-drug lethal injection formula is potassium chloride, whose immediate effect in the dose given is to stop the heart and hasten death.  According to the Texas Department of Corrections, the inmate is "usually pronounced dead approximately seven minutes after the lethal injection begins." *See generally*  Texas  Department  of  Corrections  website,  available  at http://www.tdcj.state.tx.us/stat/drowfacts.htm.

---

[18]To Mr. Rivas' knowledge, no Fifth Circuit decision squarely answers the "cruel and unusual"question presented by this claim. At least one Texas inmate awaiting execution has presented, and has had denied, a civil rights claim on the same Eight Amendment theory, but the claim was rejected on procedural grounds. *See Reese v. Livingston*, 453 F.3d 289 (5th Cir. 2006).

# ARGUMENT

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." And since the basic concept underlying the Eighth Amendment is nothing less than the dignity of man, the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958).

The Eighth Amendment's prohibition against "cruel and unusual punishments" must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework, the Supreme Court has established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be "cruel and unusual." *Roper v. Simmons*, 543 U.S. 551 (2005), citing *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958).

The record of "botched" executions under the method described above is clear, and the list too long to continue pretending that lethal injection, or at least the risk of a botched procedure, is not cruel and unusual punishment. The Death Penalty

Information Center reports, among many, many others, the following illustrative list of supposedly quick and painless lethal injections gone wrong:

1) April 23, 1998. Texas. Joseph Cannon. Lethal Injection. It took two attempts to complete the execution. After making his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.

2) May 7, 1992. Texas. Justin Lee May. Lethal Injection. May had an unusually violent reaction to the lethal drugs. According to one reporter who witnessed the execution, May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze ...." Associated Press reporter Michael Graczyk wrote, "Compared to other recent executions in Texas, May's reaction was more violent. He went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

3) May 24, 1989. Texas. Stephen McCoy. Lethal Injection. He had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching

off the gurney, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness. Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought the fainting would catalyze a chain reaction. The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."[19]

The State of Florida uses a "cocktail" of drugs substantially similar if not identical to that in store for Mr. Rivas. National attention was recently focused on the execution there of Angel Nieves Diaz, 55, who was put to death on December 13, 2006. The cocktail is supposed to assure quick and painless death. But medical examiner Dr. William Hamilton said Diaz's execution in Florida took 34 minutes — twice as long as usual — and required a rare second dose of lethal chemicals because the needles were inserted clear through his veins and into the flesh in his arms. The chemicals are supposed to go into the veins.  Florida Gov. Jeb Bush suspended all executions there after this bungled execution.[20]   Hamilton, who performed the

---

[19]*See* Michael Radelet, *Some Examples of Post-Furman Botched Executions*, *available at* http://www.deathpenaltyinfo.org/article.php?scid=8&did=478 for extensive article with citations to eyewitness accounts and list of similarly botched executions.

[20]Jurist Legal News and Research, December 31, 2006, *available at* http://jurist.law.pitt.edu/currentawareness/jeb.php.

autopsy, refused to say whether he thought Diaz died a painful death. "I am going to defer answers about pain and suffering until the autopsy is complete," he said. He said the results were preliminary and other tests may take several weeks.[21]

There is a substantial and unacceptable possibility that Mr. Rivas' own death will be similarly prolonged and will cause wanton and unnecessary pain, notwithstanding – or, perhaps, "given that" – the TDC's representation that the "average" inmate dies within seven minutes.

There is support among some in the medical community for Mr. Rivas' claim that lethal injection is cruel:

> American researchers have called for a halt to lethal injection, the most common method of capital punishment in the United States, because it is not always a humane and painless way to die. Some executed prisoners may have suffered unnecessarily because they had not been sedated properly, they said. The way inmates are given lethal injections does not even meet veterinary standards for putting down animals, they added. The research was carried out by Leonidas Koniaris of the University of Miami Miller School of Medicine, and colleagues.
>
> "Failures in protocol design, implementation, monitoring and review might have led to unnecessary suffering of at least some of those executed," Koniaris said in a study published in The Lancet medical journal."Therefore, to prevent unnecessary cruelty and

---

[21] *See* "Executions Halted in Two States After Botched Injection," *available at* http://www.cnn.com/2006/LAW/12/15/diaz.execution.ap/index.html

suffering, cessation and public review of lethal injections is warranted."

Koniaris said anaesthesia was given during a lethal injection to minimise suffering. Without it the prisoner would suffocate and experience horrible pain. But in their analysis of protocols followed during lethal injections in Texas and Virginia, where 45 per cent of executions in the US are conducted, the researchers found there was no monitoring of the anaesthesia. Emergency medical technicians who administered the drugs had no training in anaesthesia and there were no reviews after the executions. When the researchers examined data from autopsies following 49 executions in Arizona, Georgia and North and South Carolina, they found concentrations of the drug in the blood in 43 cases were lower than that needed for surgery. Twenty-one prisoners had drug levels that were consistent with awareness. "We suggest that it is possible that some of these inmates were fully aware during their executions," Koniaris said.

An editorial in the journal said if the inmates were awake it would have been a cruel way to die because they would have been unable to move or breathe while potassium burned through their veins.[22]

Separately, a federal judge in California has imposed a moratorium on executions in that state, declaring that the state's method of lethal injection runs the risk of violating the constitutional ban on cruel and unusual punishment. District Judge Jeremy Fogel has ruled in San Jose that California's "implementation of lethal

---

[22]*See Lethal Injection Execution Cruel, Say US Researchers.* April 15, 2005, *available at* http://www.smh.com.au/news/World/Lethal-injection-execution-cruel-says-US-researchers/2005/04/14/1113251743563.html

injection is broken." But he said: "It can be fixed."  Fogel said the case raised the

question of whether a three-drug cocktail administered by the San Quentin State

Prison is so painful that it "offends" the Eighth Amendment ban on cruel and unusual

punishment.   Fogel said he was compelled "to answer that question in the

affirmative." Fogel found substantial evidence that the last six men executed at San

Quentin might have been conscious and still breathing when lethal drugs were

administered.[23]

It remains to be seen whether, as Judge Fogel has confidently predicted, the

system of execution in California, substantially similar to the one in Texas, "can be

fixed." There is no doubt, however, as shown above, that it is broken, or at least that

it breaks down in too many cases to pass Eighth Amendment scrutiny.  Mr. Rivas is

entitled to a new sentencing hearing.[24]

---

[23]*See* "Executions Halted in Two States After Botched Injection"
http://www.cnn.com/2006/LAW/12/15/diaz.execution.ap/index.html

[24]The Texas Court of Criminal Appeals made no findings as to this claim because it was not raised on direct appeal or in the state habeas application. As a result, Mr. Rivas acknowledges that the claim remains unexhausted.. To prevail on this claim, he must file a subsequent application for a writ of habeas corpus, pursuant to Tex. Code Crim. P. Art. 11.07, sec. 5, asserting that the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application. Due to the statute of limitations imposed by the A.E.D.P.A., Mr. Rivas must file his federal habeas petition now.  Due to the Texas courts' observance of the two-forum rule, he may not file a subsequent application in the state court while his federal petition is pending. *See, e.g., Ex Parte Sofar,* 143 S.W. 3d 804, 805 (Tex. Crim. App. 2004).  If he wants to seek relief in the Texas courts on this claim, he will have to request that this Court dismiss this petition without prejudice and grant leave to refile this federal petition in the event the state court denies his subsequent writ application. Mr. Rivas is not requesting that this Court do so immediately.  Counsel for Mr. Rivas intends to

injection is broken." But he said: "It can be fixed."  Fogel said the case raised the

question of whether a three-drug cocktail administered by the San Quentin State

Prison is so painful that it "offends" the Eighth Amendment ban on cruel and unusual

punishment.  Fogel said he was compelled "to answer that question in the

affirmative." Fogel found substantial evidence that the last six men executed at San

Quentin might have been conscious and still breathing when lethal drugs were

administered.[23]

It remains to be seen whether, as Judge Fogel has confidently predicted, the

system of execution in California, substantially similar to the one in Texas, "can be

fixed." There is no doubt, however, as shown above, that it is broken, or at least that

it breaks down in too many cases to pass Eighth Amendment scrutiny.  Mr. Rivas is

entitled to a new sentencing hearing.[24]

---

[23]*See* "Executions Halted in Two States After Botched Injection"
http://www.cnn.com/2006/LAW/12/15/diaz.execution.ap/index.html

[24]The Texas Court of Criminal Appeals made no findings as to this claim because it was not raised on direct appeal or in the state habeas application. As a result, Mr. Rivas acknowledges that the claim remains unexhausted.. To prevail on this claim, he must file a subsequent application for a writ of habeas corpus, pursuant to Tex. Code Crim. P. Art. 11.07, sec. 5, asserting that the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application. Due to the statute of limitations imposed by the A.E.D.P.A., Mr. Rivas must file his federal habeas petition now.  Due to the Texas courts' observance of the two-forum rule, he may not file a subsequent application in the state court while his federal petition is pending. *See, e.g., Ex Parte Sofar,* 143 S.W. 3d 804, 805 (Tex. Crim. App. 2004).  If he wants to seek relief in the Texas courts on this claim, he will have to request that this Court dismiss this petition without prejudice and grant leave to refile this federal petition in the event the state court denies his subsequent writ application. Mr. Rivas is not requesting that this Court do so immediately.  Counsel for Mr. Rivas intends to

4.    VIOLATION OF DUE PROCESS -- IMPROPER ALLOCATION OF
      BURDENS OF PROOF IN JURY INSTRUCTIONS

**FACTUAL BACKGROUND**

The current "mitigation" special issue in Texas, and the one applied in this case

was as follows:

> Do you find, taking into consideration all of the evidence,
> including the circumstances of the offense, the defendant's
> character and background, and the personal moral
> culpability of the defendant, that there is a sufficient
> mitigating circumstance or circumstances to warrant that a
> sentence of life imprisonment rather than a death sentence
> be imposed?

(C.I, 265).

Consistent with current Texas law, the jury charge did not impose any burden

of proof as to mitigation on either the State or Appellant.  Appellant objected at trial

on the basis that the court's charge failed to place the burden of proof as to the above

special issue upon the State.  Appellant's objection was overruled. (R.44, 44-45).

---

request that this Court take such action only if the facts developed in relation to the botched Diaz
execution prove to warrant such action or other future legal developments warrant such action.

# ARGUMENT

**Mr. Rivas recognizes at the outset that this issue if foreclosed in the Fifth Circuit.[25] The claim is raised and argued here to preserve it for a potential petition for writ of certiorari.**

The United States Supreme Court has declared that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty. *See Ring v. Arizona,* 536 U.S. 584 (2002).  Applying the holdings from its previous decisions in *Jones v. United States*, 526 U.S. 227 (1999), and in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court stated: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n. 6. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact—no matter how the state labels it—must be found by a jury beyond a

---

[25]*See Rowell v. Dretke,* 398 F.3d 370 (5th Cir. 2005).

reasonable doubt." *Apprendi*, 530 U.S. at 482-83. Therefore, that which has the effect

of increasing punishment beyond a maximum statutory sentence must be considered

the functional equivalent of an element of an offense greater than the one covered by

the jury's guilty verdict. *Id.,* 530 U.S. at 495.

*Apprendi, supra,* involved a New Jersey "hate crime" statue that provided for

a lengthier prison term if the trial judge found, by a preponderance of the evidence,

that a defendant committed a crime with a biased purpose. The Supreme Court held

that the Due Process Clause required that such a factual determination be made by a

jury on the basis of proof beyond a reasonable doubt. *Id.,* 530 U.S. at 490. The Court

based its holding in the fact that if a "sentencing factor" serves to increase a sentence

beyond the maximum sentence otherwise statutorily authorized, "it is the functional

equivalent of an element of a greater offense than the one covered by the jury's guilty

verdict. Indeed, it fits squarely within the usual definition of an 'element' of the

offense." *Id.* at 494 n. 19.

*Apprendi*'s "element's rule" was extended to capital prosecutions in *Ring,*

*supra*. In *Ring*, the Supreme Court held that, under *Apprendi,* "[b]ecause Arizona's

enumerated aggravating factors operate as "the functional equivalent of an element of

a greater offense," the Sixth Amendment requires that they be found by a jury." *Id.,*

536 U.S. at 605 (citation omitted) (quoting *Apprendi*, 530 U.S. at 494).

76

The distinction must be drawn between the "elements" of a crime and factors that simply influence a criminal sentence. For example, a finding that only increases a mandatory *minimum* penalty is not an element of a separate offense, and therefore need not be proven beyond a reasonable doubt. *See Harris v. United States,* 536 U.S. at 557, discussing *McMillan v. Pennsylvania*, 477 U. S. 79 (1986). In a portion of the *Harris* opinion, Justice Kennedy, joined by three other justices, wrote, "those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis." *Id.,* 536 U.S. at 567.

In the instant case, the jury's guilty verdict would have resulted in a life sentence unless and until the State proved beyond a reasonable doubt that answers to the first two special issues were "yes." This additional requirement of proving the first two special issues, once satisfied, would have acted to convert a life sentence to that of death. The State's failure to convince the jury that the first two special issues should be answered "yes," or failure of jurors to unanimously agree, would have resulted in imposition of the life sentence applicable once finding a guilt occurred. In that respect, the special issues are factors which are virtually indistinguishable from the aggravating circumstances found to be "the functional equivalent of an element of a greater offense." *Ring*, 536 U.S. at 609 , quoting *Apprendi*, 530 U.S. at 494 n.

(holding that death-eligibility factors "operate as 'the functional equivalent of an element of a greater offense.'")

The Texas special issues constitute death-eligibility factors which are the functional equivalents of elements, and must therefore be proven to a jury beyond a reasonable doubt. Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution. U.S. CONST., amend XIV.

The Court of Criminal Appeals rejection of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Apprendi, Jones,* and *Ring, supra.* Again adopting state-prepared findings of fact, the Court of Criminal Appeals reasoned that "[t]he mitigation issue does not operate to increase the penalty beyond the statutory maximum. In Texas, the maximum penalty for a capital offense is death. A jury's answer to the mitigation issue does not have the potential to increase that penalty, only to reduce it." *See* Attachment 3, ¶343. This is an unreasonable application of *Apprendi,* for the jury's no vote on mitigation did serve in effect o increase the statutory maximum from life imprisonment to death. The trial court's imposition of the death sentence should be reversed.

5.   VIOLATION OF DUE PROCESS -- FAILURE TO DEFINE VAGUE
TERMS "SPECIAL ISSUES"  INSTRUCTION TO THE JURY

## FACTUAL BACKGROUND

In the punishment phase, the jury was instructed pursuant to TEX. CODE

CRIM. PROC art. 37.071 as follows:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a

probability that the defendant, George Rivas, would commit criminal acts of violence

that would constitute a continuing threat to society?

### Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that the defendant,

George Rivas, actually caused the death of the deceased or did not actually cause the

death of the deceased but intended to kill the deceased or another or anticipated that

a human life would be taken?

### Special Issue No. 3

Do you find, taking into consideration all of the evidence, including the

circumstances of the offense, the defendant's character and background, and the

personal moral culpability of the defendant, that there is sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? (C.I, 264-265) (44 RR 52).

## ARGUMENT

**Mr. Rivas acknowledges that this claim (that the terms used in the special instructions given to Texas juries in death penalty cases are unconstitutionally vague) has been rejected by the Fifth Circuit.** *See Anderson v. Quarterman*, **slip copy, 2006 WL 3147544 (5th Cir. Nov. 1, 2006),** *citing James v. Collins*, **987 F.2d 1116, 1120 (5th Cir.1993) (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" "have a common-sense core of meaning that criminal juries should be capable of understanding") (internal quotation omitted);** *see also Hughes v. Johnson*, **191 F.3d 607, 615 (5th Cir.1999);** *Woods v. Johnson*, **75 F.3d 1017, 1033-34 (5th Cir.1996) . He wishes to preserve this error for further review in the event relief is not otherwise granted herein.**

The jury received no instructions concerning the meaning of the crucial terms in the special issues, specifically, the terms "probability," "criminal acts of violence," or "continuing threat to society." This failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and

reasonably justify the imposition of the death penalty. *See Godfrey v. Georgia,* 466 U.S. 420 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death sentence upon Mr. Rivas in comparison to other cases in which other defendants received a life sentence. This failure to properly instruct the jury violated Mr. Rivas' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Texas special issues applied in this case function as aggravating circumstances. An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s]] the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862. 878 (1983). An affirmative finding to the first special issue and a negative response to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant.* When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function. A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope. *Maryland v. Cartwright,* 486 U.S. 356 (1988).

Because the Texas special issues contain terms that are unconstitutionally vague, the special issues are unconstitutional as applied to Mr. Rivas. His death sentence must therefore be vacated. *See Walton v. Arizona,* 497 U.S. 639, 110 S.Ct,. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers,* 497 U.S. 766 (1990).

In Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise aggravating circumstances under the Constitution: "[T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of (capital murder) as defined under §19.03 (capital murder statute)." *Smith v. State,* 779 S.W.2d 417, 419 (Tex. Crim. App.1988); *Roney v. State,* 632 S.W.2d 598, 603 (Tex. Crim. App. 1982) (the facts of crime alone do not provide death-eligibility, otherwise every murder in the course of robbery would warrant a capital sentence). The Texas special issues cannot suffice as a framework for the imposition of the death penalty if the special issues themselves contain crucial terms that are undefined and inherently vague.

The Texas Court of Criminal Appeals has refused to apply any limiting construction to the unconstitutionally vague terms in the special issues special issues must channel sentencing discretion by adequately informing juries "what they must find to impose the death penalty." *Maryland v. Cartwright,* 486 U.S. at 362. Texas

82

allows its capital juries virtually unfettered discretion in construing the statutory aggravating circumstances without the aid of specific definitions of crucial terms contained in the special issues. *Roney v. State* 632 S.W.2d at 603. Yet that function is articulated through the use of the special issue questions, which employ broad terms that result in standardless capital sentencing determinations. Such a result runs directly counter to the Eighth Amendment's requirement that there be a rational process for juries and appellate court to decide who lives and who dies.

In the first special issue, the word "probability" has no common or uniform meaning. Jurors in the instant case were left to apply any possible interpretations of the word, including: about fifty percent; a substantial likelihood; or, technically, any chance at all. Additionally, jurors were denied any meaning for the phrase "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence. In *Jurek v. Texas,* 428 U.S. 262, 272 (1976), a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence," and "a continuing threat to society." Such failure has rendered the first special issue unconstitutional.

83

In its decision on Mr. Rivas' direct appeal, the Court of Criminal Appeals rejected this claim. *See* Attachment 1, p. 9. It offered no reasoning and simply reaffirmed its holdings in *Ladd v. State*, 3 S.W. 3d 547, 572-73 (Tex. Crim. App. 1999) *cert. denied*, 529 U.S. 1070 (2000) and *Camacho v. State*, 864 S.W. 2d 524, 536 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 1215 (1994). The Court of Criminal Appeals rejection of this claim was contrary to, and  involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Maryland v. Cartwright, supra.* Appellant's death sentence should be modified to life.

## ARGUMENT

**Mr. Rivas acknowledges that this claim is foreclosed in the Fifth Circuit.[27]**

**He wishes to preserve this error for further review in the event relief is not**

**otherwise granted herein.**

Article 37.071 of the Texas code of Criminal Procedure  creates the potential

for considerable confusion among reasonable jurors.[28]  The rule generates the danger

that jurors otherwise pre-disposed to hold out for a life sentence will conform to a

"majority rules" mentality.  That is, they may reasonably believe that their votes in

favor of a life sentence are worthless unless nine others join them.  If a majority of

other jurors are firmly voting "yes," holdouts may feel an obligation to join them since

there would appear to be no possibility of a life sentence and the jury has been

instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383 (1988):

"[C]ommon sense suggests that juries do not leave blanks and do not report

---

[27]In *Miller v. Johnson,* 200 F.3d 274 (5th Cir. 2000), "[t]his Court has explained that *Mills* [*v. Maryland,* 486 U.S. 367 (1988)] is not applicable to the capital sentencing scheme in Texas. We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance[,]'" *citing Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir.1994).

[28]The Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *See California v. Brown*, 479 U.S. 538, 541 (1987); *Francis v. Franklin*, 471 U.S. 307, 315-316 (1985).

themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so."

Support for this argument comes in the Supreme Court cases criticizing the trial court practice of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations. *See, e.g., Lowenfeld v. Phelps*, 484 U.S. 231, 239-240 (1988) and *Brasfield v. United States*, 272 U.S. 448, 450 (1926). In such cases, the Supreme Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear "in some degree, serious although not measurable, an improper influence upon the jury." *Lowenfield*, 484 U.S. at 239, *citing Brasfield*, 272 U.S. at 450.

Put another way, Texas' 12/10 Rule is a built in impermissible "dynamite charge" which has been recognized as a possible violation of U.S. CONST. Amend. VIII in the capital sentencing context. *See Lowenfield*, 484 U.S. at 240-241. Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations – a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams,* 392 So.2d 619, 631 (La. 1980) (on rehearing), where the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality .... Instead, the members of the sentencing body were left free to speculate as to what the

outcome would be in the event there was no unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial before another jury would be required.

Such a risk of speculation and confusion was held to be a constitutional violation by the Louisiana Supreme Court. *Id.*

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland*, 486 U.S. 367 (1988)[29] that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote for a life sentence is worthless unless some threshold number of jurors agree that particular mitigating factors exist. That is, a constitutional violation exists if a reasonable juror could interpret the charge to mean that there must be a meeting of the minds among some threshold number of jurors[30] as to whether the mitigating evidence offered by the defendant warrants either a negative answer to the first special issue, or an affirmative response to the second, thus resulting in the imposition of a life sentence. *Mills v. Maryland*, 486 U.S. 373-375. Unless jurors are informed of the

---

[29]Mr. Rivas acknowledged hereinabove that the Fifth Circuit has rejected attempts to extend the application of *Mills* to the Texas capital sentencing scheme. *See* footnote 6, *supra p. 52.*

[30]In *Mills*, the threshold number was twelve, while in Texas it is ten.

result of a deadlock in such a situation, the risk that one or more jurors will give in to a "majority rules" mentality is too great under the Eighth Amendment.

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Art. 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them. In *Kubat v. Thieret*, 867 F.2d 351, 369-373 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989), while finding a *Mills* violation, the Seventh Circuit was faced with a capital sentencing scheme similar to the one at issue here:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death .... [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id*. at 373.

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. In other words, Texas jurors are erroneously led to believe that, even if they want to vote for life, a mistrial, or possibly a death sentence, rather than a life sentence (the constitutionally required result) will result unless nine

89

other jurors join them in their vote.  This feature of article 37.071 creates the potential

for considerable confusion among reasonable jurors.  Because "there is a reasonable

likelihood that the jury has applied the challenged instruction in a way that prevented

the consideration of constitutionally relevant mitigating evidence," *Boyde v.*

*California*, 494 U.S. 370, 380 (1990),  Mr. Rivas was sentenced to death in an

unconstitutional manner.

In its decision rejecting this claim on direct appeal, the Court of Criminal

Appeals offered no reasoning and simply reaffirmed its holdings in *Williams v. State,*

937 S.W. 2d 479, 490 (Tex. Crim. App. 1996); *Lawton v. State*,  913 S.W. 2d 542,

558-59 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996); and *Draughton v.*

*State*, 831 S.W. 2d 331, 337-38 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926

(1993).  The state court's decision was contrary to and involved an unreasonable

application of clearly established Federal law, as determined by the Supreme  Court

of the United States in  *Mills v. Maryland, supra* p. 87.  For this reason, the judgment

of the trial court should be reversed and the cause remanded for a new punishment

hearing.

7.     VIOLATION OF DUE PROCESS -- JURY INSTRUCTION PREVENTING DEFENDANT FROM SHOWING UNLIKELIHOOD OF RELEASE ON PAROLE

## FACTUAL BACKGROUND

In its charge to the jury in the guilt-innocence phase, the Court stated:

> Under the law applicable to this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot be accurately predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted. **During your deliberations, you are not to consider or discuss the possible action of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, now how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours.**

(44 RR 49-50, emphasis added)

The defense timely objected to this instruction on constitutional grounds (44 RR 45),

and requested in its place a different instruction simply informing the jurors that a life

sentence would result in a minimum term of forty years before Mr. Rivas would be eligible for parole consideration.[31]

## ARGUMENT

**This claim has been rejected by the Fifth Circuit.[32]  Mr. Rivas wishes to preserve this error for further review in the event relief is not otherwise granted herein.**

According to the Texas Court of Criminal Appeals, the jury in a Texas capital murder case may not consider any aspect of parole in answering the special issues. *See, e.g., Knox v. State,* 744 S.W. 2d 53, 63-64 (Tex. Crim. App. 1987), *cert. denied,* 486 U.S. 1061 (1988); TEX. CODE CRIM. PROC. ANN. Art 37.07 § 4(a) (Vernon Supp. 1999).  But as the Supreme Court declared in *Simmons v. South Carolina,* 512 U.S. 154, 168-169:

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence

---

[31]Mr. Rivas' Special Requested Charge Number one at the punishment phase requested the following: "Regarding the law of parole, you are instructed that a prisoner under a sentence of death is not eligible for parole. A prisoner serving a life sentence for a capital felony is not eligible for release on parole until the actual calendar time the prisoner has served without consideration of good conduct time, equals 40 calendar years."  (CR 143)

[32]*See Thacker v. Dretke*, 396 F.3d 607, 617 (5th Cir.2005) ( "Since *Simmons* was decided, we have repeatedly held that neither the Due Process clause nor the Eighth Amendment require Texas to allow presentation of parole eligibility issues, because Texas does not offer, as an alternative to capital punishment, life imprisonment without possibility of parole.")

> to death is life without parole will necessarily undercut the state's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

The Supreme Court further concluded that a jury instruction not to consider parole not only failed to rectify the problem, but actually exacerbated it. *Id.* at 170-171. Due process affords a capital defendant the right to answer future dangerousness allegations with information regarding parole ineligibility. *Id.* at 171.

In Texas, the State necessarily relies on future dangerousness in every death penalty case. *See* TEX. CODE CRIM. PROC. ANN. art 37.071 §3(b)(2). Within the meaning of the special issue on future dangerousness, the term "society" includes the population both in and out of prison. *Smith v. State*, 898 S.W. 2d 838, 846 (Tex. Crim. App. 1994), *cert. denied*, 516 U.S. 843 (1995). The Texas Court of Criminal Appeals has traditionally determined that juries need not even learn about minimum parole eligibility because the defendant constitutes a threat, either to his fellow inmates or the general public, regardless of the amount of time spent in prison. *See, e.g., Willingham v. State,* 897 S.W. 2d 351, 359 (Tex. Crim. App. 1994), *cert. denied*, 516 U.S. 946 (1995). This rationale, however, ignores the fact that incarcerated felons reside in a

93

highly structured environment, under close supervision by authorities and the strict enforcement of institutional regulation.

More importantly, the jury ought to possess the power to decide whether a defendant presents a future threat in either society. To do this, the ultimate fact finder must know in which "society" the defendant will reside. In assessing future dangerousness, a jury should not be instructed not to consider that a defendant will serve at least 40 calendar years before becoming eligible for parole. Reviewing courts should not arbitrarily assume that the jury would find minimum parole eligibility information relevant. To the contrary, as the Supreme Court declared in *Simmons*,

> In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to a society than one who is not. Indeed, there may be no greater assurance of a defendant's future non-dangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled without well-established precedents interpreting the Due Process Clause.

*Simmons v. South Carolina*, 512 U.S. at 163-164. The length of a capital inmate's incarceration is thus indisputably relevant to the issue of future dangerousness, and a jury determining future dangerousness should be allowed to consider the fact that

a defendant will spend at least 40 years incarcerated before becoming eligible for parole consideration.

The reasoning applied in *Simmons* applies equally to a capital defendant's forty-year parole eligibility in Texas as it did to Simmons's parole ineligibility. *See Brown v. Texas*, 522 U.S. 940 (1997); *contra Collier v. State*, 959 S.W. 2d 621, 623-24 (Tex. Crim. App. 1997); *Smith v. State*, 898 S.W. 2d at 848-53. The Supreme Court pointed out, in fact, that Texas and North Carolina both preclude juries from considering parole information, but do not provide a life-without-parole sentencing alternative to capital punishment. *Simmons,* 512 U.S. at 168 n.8. The *Simmons* opinion addressed this type of situation only as follows:

> In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole. States reasonably may conclude that truthful information regarding the availability of commutation , pardon, and the like, should be kept from the jury in order to provide "greater protection in [the states'] criminal justice system than the Federal Constitution requires." [Citation omitted. Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release.

*Id.* at 168.

Although Texas law at the time of Mr. Rivas' trial did not require convicted capital defendants to serve "life" sentences without the possibility of parole, as in South Carolina, the difference is negligible. If assessed a life sentence, Mr. Rivas would have been compelled to serve at least forty calendar years in prison before even becoming eligible for parole . Mr. Rivas was 31 years old at the time of trial (42 RR 11), and was already serving multiple life terms, two of which were consecutive, even before he escaped from prison, committed the additional robbery at Oshman's, and shot Officer Hawkins. If he had been sentenced to life imprisonment, he would have remained ineligible for parole consideration until he was at least 71 years old.

There can be no serious argument but that Mr. Rivas, considering his prior record outside of prison, the multiple life terms he was already serving at the time of this offense, his violent escape from inside the prison, followed by his organizing and execution of a conspiracy to commit an armed robbery, all coupled with his shooting of a police officer in the line of duty, which shooting at least contributed to the officer's death, followed by continued escape across multiple state lines, effectively eliminated any real possibility of early release on parole, even at age 71.

Consequently, the trial court's instruction that the jury could not consider parole, or the low likelihood of his ever being released on parole, denied Mr. Rivas

due process of law.[33]   *Simmons* itself turns on the jury's right to rely on truthful information to decide future dangerousness. The trial court's instruction flies in the face of due process.   Informing the jury about the forty year minimum while simultaneously prohibiting the jury from considering the information does nothing to remedy the problem addressed by the Supreme Court in *Brown v. Texas*, in which Justice Stevens noted in dissent:

> In Texas, although juries are required to assess a capital defendant's future dangerousness before sentencing him to death, he is prohibited from presenting truthful information to the jury about when he would be eligible for parole if sentenced to life. In the present case, the petitioner would have been required to spend 35 years in prison before becoming eligible for parole if he had been sentenced to life imprisonment [footnote omitted].  He sought to present this information to the jury, coupled with evidence that people become less dangerous over time. He was prohibited from doing so under Texas law ....

> There is obvious tension between this rule and our basic holding in *Simmons v. South Carolina* [citation omitted]. As Justice Scalia correctly observed, a logical application of that holding would permit "the admission of evidence showing that parolable life-sentence murderers are in fact almost never paroled, or are paroled only after age 70; ... or evidence showing that, though under current law the defendant will be parolable in 20 years, the recidivism rate for elderly prisoners released after long incarceration is negligible [citations and footnotes omitted].

---

[33]It follows that Mr. Rivas was denied effective assistance of counsel due, on this point of error, not to errors or omissions of counsel, but to a faulty jury instruction. There is no evidence in the record of Mr. Rivas' virtual ineligibility for parole considering his record. But the instruction clearly prohibited trial counsel from developing the fact that Mr. Rivas is certain to never leave prison on parole, and it prohibited him from vigorously arguing the point in closing argument as Mr. Rivas was entitled.

*Brown v. Texas*, 522 U.S. 940 (1997) ( Stevens, J., respecting the denial of petition for writ of certiorari.)

Though the jury was informed of the forty-year minimum faced by Mr. Rivas, the information was of no consequence since the jury was also instructed not to consider the information for any purpose. If the parole eligibility information detracts so from the judicial process – presumably this is the reason for its having been censored, though perversely broadcast – one wonders why it is mentioned at all. Worse, the admonition that the information not be considered unfairly crippled the defense's chance to affirmatively show and argue that Mr. Rivas will never be paroled.

In its decision rejecting this claim on direct appeal, the Court of Criminal Appeals offered little reasoning, and instead observed simply: "We disagree. Consistent with [Texas Code of Criminal Procedure art. 37.071, §2(e)(2)(B), this part of the charge instructed the jury not to consider how long a life-sentenced appellant would serve after becoming eligible for parole." *See* Attachment 1, p. 8. The state court's decision was contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States in *Simmons v. South Carolina, supra* p. 93. For this reason, the judgment of the trial court should be reversed and the cause remanded for a new punishment hearing.

## **CONCLUSION**

Both the guilt-innocence and punishment phases of Mr. Rivas' trial were legally and constitutionally flawed.  Based on the foregoing arguments, Mr. Rivas  requests issuance of a Writ of Habeas Corpus or, in the alternative, an evidentiary hearing to resolve disputed facts.

Respectfully submitted,


Franklyn Mickelsen
Texas Bar # 14011020
2707 Hibernia Street
Dallas, TX 75204
214-720-9552
214-720-9594 (facsimile)


Robert J. Herrington
Texas Bar # 00790163
P.O. Box 262234
Plano, TX 75026-2234
214-557-0577
214-557-0599
Attorneys for the Petitioner
George Rivas

## **CERTIFICATE OF SERVICE**

I, Franklyn Mickelsen, certify that on the 13th day of February, 2007, I caused

the foregoing memorandum to be served by first class mail, postage prepaid, on the

Office of the Texas Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas

78711.

Franklyn Mickelsen

100